ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of - | ) | |
| | ) | |
| Amatea/Grimberg JV | ) | ASBCA Nos. 60426, 60427, 60428 |
| | ) | 60689, 60690, 60691 |
| | ) | 61252, 61402, 61715 |
| | ) | |
| Under Contract No. N40080-09-C-0171 | ) | |

APPEARANCES FOR THE APPELLANT:      Stephen H. Swart, Esq.
                                    Arnie B. Mason, Esq.
                                    Melisa A. Roy, Esq.
                                     Williams Mullen
                                     Tysons Corner, VA


APPEARANCES FOR THE GOVERNMENT:   Craig D. Jensen, Esq.
                                    Navy Chief Trial Attorney
                                   Joshua S. Kauke, Esq.
                                    Trial Attorney


OPINION BY ADMINISTRATIVE JUDGE PROUTY

        These nine appeals, brought pursuant to Board Rule 11, stem from disputes over the performance of a design/build construction contract (the contract) to erect a laboratory building for the Engineering Directorate of the Naval Surface Warfare Center located at Indian Head, Maryland.  Many things went wrong during the pendency of the project, beginning with poor site conditions that required remediation, and including disputes over the partial re-design of the fire sprinkler system and who was responsible for the installation of an electronic security system.  Appellant, the Amatea/Grimberg Joint Venture (AGJV or the joint venture) maintains that respondent, the United States Navy (the Navy), only made things worse by the contentious manner in which it administered the contract:  unreasonably refusing to allow AGJV to work on nights and weekends and wrongfully refusing to extend the project completion date, therefore requiring AGJV to incur the additional expenses that followed from accelerating its work.  The joint venture also argues that the Navy's imposition of liquidated damages for the late completion of the project was unjust, given the Navy's supposed responsibility for the delays and the Navy's use of an unreasonable beneficial occupancy date.

        As will be explained below, the Navy largely—but not completely—prevails here.  The conditions at the site, though an absolute mess after AGJV began working on it, were not inconsistent with what could have been anticipated from the

information provided by the Navy with the solicitation and were somewhat AGJV's fault. Moreover, the contracting officer's (CO's) decision not to afford AGJV the opportunity for night and weekend work was not a breach of the duty of good faith and fair dealing as the Navy had sufficient reasons to deny the request to make its exercise of discretion reasonable. On the other hand, the Navy does owe AGJV additional money for the fire sprinkler system (not as much as AGJV claims) and for the electronic security system which was required by the contract but was not completely paid for by the Navy. Additionally, the Navy should have found the building ready for beneficial occupancy at an earlier date than it did, which leads to lower liquidated damages due the government. Finally, we find the acceleration claims to be unsupported.

FINDINGS OF FACT

I. The Contract

The contract to erect the laboratory building that is the subject of this dispute (the lab building) was a design/build contract that was awarded as a competitive small business set-aside. The procurement was done in two phases: in the first phase, the Navy basically selected a small number of contractors that (based on the solicitation criteria) were suited to perform the work. In the second phase, those contractors selected in the first phase responded to the solicitation for the project and were judged upon that response. (*See generally*, R4, tab 1) AGJV was one of the three teams that were selected by the first phase of the procurement and were invited to participate in the second phase by responding to the solicitation (R4, tab 3 at GOV 35).[1]

On July 10, 2009, the government issued the request for proposals (RFP) (R4, tab 3 at GOV 32)[2]. The RFP included various contract line items, and provided that the work to be performed under each line item was delineated in the

---

[1] The government has placed Bates numbers at the bottom of the pages of its Rule 4 file, beginning with the descriptor "GOV_ORIG_R4_" after which follows a seven-digit number, beginning with zeroes. For greater ease of use, we replace this with "GOV ___" in which the seven-digit number is replaced by only the digits actually used. Thus, for example, we replace GOV ORIG-R4 0000005 with GOV 5. We similarly curtail appellant's Bates numbers to "APP __" followed by only the digits actually used.

[2] The solicitation is at tab 3 of the Rule 4 file, while the executed contract, which incorporates some portions of the solicitation (as noted below), is at tab 24. Throughout the remainder of this opinion, we generally cite the solicitation document at tab 24, since that is associated with the executed contract.

2

RFP's technical specifications and drawings, which were organized into "parts" (*id.* at GOV 37-38; R4, tabs 4-9).

On September 30, 2009, AGJV was awarded the contract to build the lab building along with several related line items from the solicitation. The contract was in the amount of $10,574,419, with a contract completion date of March 31, 2011. (R4, tab 24 at GOV 1153) Of relevance here, the contract incorporated the RFP's Price Schedule and the specifications and drawings (R4, tab 24 at GOV 1155).[3]

The contract included the standard liquidated damages clause found in the Federal Acquisition Regulation (FAR) at section 52.211-12 Liquidated Damages – Construction (SEP 2000), which, modified to insert a specific dollar figure, provided in part that: "[i]f the Contractor fails to complete the work within the time specified by the contract, the Contractor shall pay liquidated damages to the government in the amount of $5,250 for each calendar day of delay until the work is completed or accepted" (R4, tab 24 at GOV 1190).

## II. Early Contract Extensions

On May 3, 2010, the parties agreed to add a number of enhancements to the building to increase its energy efficiency. By bilateral[4] contract Modification No. A00001 (Mod 1), AGJV agreed to make the various energy efficiency enhancements to the building for an additional $1,040,783 (raising the contract price to $11,615,202) and a 90-day extension to the contract completion date, which would now be June 29, 2011. (R4, tab 26 at GOV 1218) This modification was followed within a few days by Modification No. A00003 (Mod 3). Mod 3 was another bilateral[5] contract modification. This one, extending the time for performance by 224 days, until February 8, 2012, in recognition of delays in the FY09 Demolition and Footprint Reduction Program which would have affected the construction site. This was a

---

[3] Although these portions of the RFP were incorporated into the contract, the parties, throughout performance and during this litigation, generally continued to refer to them as RFP provisions, not contract provisions. For consistency, we adopt the parties' terminology.

[4] The copy of Mod 1 in the government-provided Rule 4 file is signed by the government, but not by AGJV (*see* R4, tab 26). Since AGJV does not raise an argument over this, we will presume that it was, in fact, a bilateral modification and that the Navy was either sloppy in obtaining AGJV's signature after forwarding the modification to AGJV or in its records-keeping. This is an all-too-common problem. *See, e.g., Metro Machine d/b/a General Dynamics NASSCO-Norfolk*, ASBCA No. 62221, 22-1 BCA ¶ 38,096 at 185,002 n.5.

[5] Yet again, with only the government's signature present (*see* R4, tab 28 at GOV 1225).

no-cost modification, with the contract price remaining at $11,617,761.[6]  (R4, tab 28 at GOV 1225)

AGJV characterizes these as "significant delays" for which the Navy admitted responsibility (app. br. at 2-3).  This is true to the extent that the extension of the contract completion date by more than 10 months was certainly significant and also a matter of the Navy's responsibility.  On the other hand, to the extent that it implies AGJV was not made whole by the extra time granted by the Navy in the two modifications, it is mistaken, since that was the point of the two negotiated modifications in question—both of which characterized themselves as acting as an "accord and satisfaction" for the extra time required (R4, tab 26 at GOV 1218, 28 at GOV 1226).

III.  A Differing Site Condition?

Appeal No.  61252 is about an alleged differing site condition:  to use a descriptive, but far from technical, term, the site turned into a muddy mess during the rains that occurred after the site was cleared, and the soil was too weak to support the construction in some areas.  Muddy fields may, to the casual observer, seem to be the kind of thing one would expect to follow heavy rains, but AGJV asserts that the soil was of a character that was far worse than should have been anticipated based on the government's description of it, leading to far greater time and expense to remedy than should have been expected.

A.  Relevant Contract Documents

1.  Contract Provisions Governing the Site and its Investigation

As would be expected, the contract included the standard differing site conditions clause prescribed by the FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 1984), which it incorporated by reference (*see* R4, tab 24 at GOV 1188).  The solicitation also included the site visit requirement associated with the differing site conditions clause in both, FAR 52.236-27, SITE VISIT (CONSTRUCTION) (FEB 1995), which was included verbatim in the document (*id*. at GOV 1168), and a similar provision, FAR 52.236-3, SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK (APR 1984), acknowledging that the contractor had investigated the site and was satisfied that it understood the conditions that would affect the work, which was incorporated by reference (*id*. at GOV 1188).[7]  The site visit provision specified that a site visit would be scheduled and included as an

---

[6] Contract Modification No. A00002 previously increased the contract price by $2,559 to pay for the removal of asbestos pipes (R4, tab 27 at GOV 1222).

[7] The two provisions are not contradictory and serve slightly different purposes.

amendment to the solicitation (*id*. at GOV 1168), which, in fact, happened (R4, tab 10) and was attended by Larry Zimmerman on behalf of John Grimberg Company (Grimberg) (R4, tab 12 at GOV 1037).[8]

Two parts of the RFP discussed the subsurface data (primarily in the guise of boring logs and what the respective party's responsibilities were. It would be fair to say that, in general, the Navy sought to avoid making too many promises about what would be encountered. In Part 3 of the RFP, Section G10 on site preparation, the Navy wrote that:

> A Geotechnical exploration has been performed at the site, and the data obtained is presented in a Geotechnical Data Report included in this RFP. The subsurface data and information presented in the report are only for the Contractor's information and are not guaranteed to fully represent all subsurface conditions. The Government shall not be responsible for any interpretation or conclusion by the Contractor drawn from the data or information.

> The Geotechnical Data Report included with this RFP is provided only to better convey data (boring logs, testing, etc) or to document observed site conditions. Requirements stated in Part Three and Part Four of this RFP take precedence over any content included in the Geotechnical Data Report.

> The Contractor is required to retain a geotechnical engineer experienced and licensed in the geographic region of the project to interpret the provided data as related to his design concept and develop requirements for bidding. Additional requirements for the geotechnical design of this project are provided elsewhere in this RFP.

> Minor variations between borings should be anticipated. The Contractor shall bear all costs associated with the site preparation and actual foundation except as allowed by the

---

[8] The government notes in its proposed findings of fact that neither the joint venture, nor its subcontractors attended the site visit; rather, only Mr. Zimmerman came on behalf of Grimberg (gov't br. at 35). Since the joint venture is comprised of employees of its constituent companies, this strikes us as an insignificant quibble.

Contract Clause FAR 52.236-2, "Differing Site
Conditions". The Contractor's Geotechnical Engineer
shall perform additional subsurface investigation as
required to adequately determine all applicable
geotechnical factors including the type and capacity of the
project foundation(s). The Contractor's Geotechnical
Engineer shall consider the provided information and any
additional information obtained and prepare a report as
described in other portions of this RFP.

(R4, tab 5 at GOV 450)

In Part 4 of the RFP, Section A10, Foundations, the General section provides in
relevant part:

Government Provided Subsurface Information

Subsurface data and information is only for the
Contractor's information and is not guaranteed to fully
represent all subsurface conditions. The Government shall
not be responsible for any interpretation or conclusion by
the Contractor drawn from the data or information. See
Geotechnical Report located in Part Six.

The assumptions, analysis, and recommendations of the
accompanying "data geotechnical" report were developed
for preliminary planning purposes only and may not be
based upon present project requirements. Requirements
stated in Parts 3 and 4 of the RFP take precedence over any
content of any included "data geotechnical" report.

The Contractor shall commission the services of a
geotechnical engineer registered as a Professional Engineer
and experienced with the soils in the Geographic region of
the project.

The Design Build Contractor's Geotechnical Engineer
shall perform subsurface investigations and laboratory
testing and submit a soils report of the soil present on the
project site.

(R4, tab 6 at GOV 475)

## 2. The Government-Provided Boring Logs

As alluded to in the contract sections above, Part 6 of the RFP included boring logs created by Dewberry & Davis, LLC, a firm that the government contracted to perform the geotechnical investigation (R4, tab 8 at GOV 853-942). Interestingly enough, the laboratory testing associated with this work was performed by ECS Mid-Atlantic, LLC (*see id.* at GOV 913)—the same company that (we shall see in the next section) AGJV would later hire as its geotechnical engineer. There were 12 boreholes in the planned location of the building and five in the planned location of the parking lot and access roadway areas (R4, tab 156 at GOV 28903-04, 29010).

We will spare the reader a borehole-by-borehole description of what was found, but we have reviewed them and find them consistent with the general description provided by the Navy's geotechnical engineering expert, Mr. Karl Hren, P.E., which is that the near surface soils were clays and fine-grained silts (Hren decl., ¶¶ 7, 13-15). More specifically, the top four feet were all fine-grained, CL, ML, or CH soil types (*id.* ¶ 15; R4, tab 8 at GOV 858).[9] The CL soils, which were the most common type of soil characterized in the boring logs (*see* R4, tab 8 at GOV 858), are known as "lean clays" (*see* R4, tab 8 at GOV 868)—a fact that will have some salience much later in this opinion.

According to Mr. Hren (and consistent with our review of the boring logs in the RFP (*see* R4, tab 8 at GOV 871-905)), in the upper two feet of the soil samples, the "blow count" was consistent with soil that was, for the most part, "soft" to "medium stiff"[10] (Hren decl. ¶¶ 12-13). No evidence has been presented by AGJV that contradicts the accuracy of this characterization. Moreover, no evidence has been presented that there was anything wrong or flawed about the Dewberry & Davis reports or the methodology that they used.

## B. AGJV's Geotechnical Reports

As required by the contract, AGJV retained its own geotechnical expert prior to beginning its excavation work: ECS Mid-Atlantic, LLC (ECS). ECS provided a

---

[9] Mr. Hren states that *all* were CL, ML, or CH in the first four feet, but we note that, for borehole B-10, the sample between two-and-a-half feet and four feet depth was MH (*see* R4, tab 8 at GOV 858). MH is a fine-grained silt that sits between CL and CH on the "Uniform Soil Classification System" chart that accompanied the boring log report in the RFP (*see* R4, tab 8 at GOV 868). Thus, the slight misstatement is of trivial import.

[10] The consistency of silt and clay soil is described in a spectrum, with the grades running from "very soft" to "soft" to "medium stiff (firm)" to "stiff" to "very stiff" and then "hard" and, finally, "very hard" (*see* R4, tab 8 at GOV 870).

preliminary report to AGJV on August 6, 2009 (Hren decl. attach.) and a more comprehensive one on March 12, 2010 as revised on August 20, 2010 (R4, tab 156). The later report relied on the government-provided boring logs from Dewberry & Davis for much of its conclusions, though ECS had considered its knowledge of the region and also run two seismic lines and conducted three shallow "hand auger" borings of its own upon which it performed laboratory work (R4, tab 156 at GOV 28899, GOV 28903-07). A map of the boring locations included in the ECS report shows that ECS's three hand-augered sites were generally in the area in which the parking lot would be built (*id.* at GOV 29010). In multiple locations, the report qualified that its conclusions were based, in part, upon the Dewberry & Davis boring data for which it did not vouch since it was not involved in collecting it (*see, e.g.*, R4, tab 156 at GOV 28904 ("we cannot be responsible for the completeness and accuracy of [this] information"), GOV 28911, GOV 28921)).

In general, the report described the data as to be consistent with what would be expected in the site's geographic location (R4, tab 156 at GOV 28909). The report also included numerous warnings about the potential for soft soil conditions[11] and pro-active steps that AGJV would need to take to ensure that the soils were not made unsuitable. The list of steps was long and included: the use of a smooth-drum roller at the end of every workday to seal the fill or subgrade material to prevent infiltration of moisture (*id.* at GOV 28912, 28921); keeping "[t]he surface of the site . . . properly graded in order to enhance drainage of the surface water away from the proposed construction areas during the earthwork phase" (*id.* at GOV 28920-21); after the final subgrade elevation was established during grading, "protect[ing the surface] with the required thickness of compacted graded aggregate to reduce erosion potential and loss of subgrade strength" (*id.* at GOV 28921); making it the "earthwork contractor's responsibility to maintain the site soils within a workable moisture content range to obtain the required in-place density and maintain a stable subgrade . . . [including] [s]carifying and drying operations" as a matter of course and not an extra (*id.*); and, finally, "that construction equipment cannot be permitted to randomly run across the site, especially once the desired final grades have been established. Construction equipment should be limited to designated lanes and areas, especially during wet periods, to help minimize disturbance of the site subgrades." (*Id.*)

In short, ECS identified many things that could go wrong to make the soils at the site unsuitable and recommended several actions to prevent this.

---

[11] As a matter of course, the report noted that the cleared and graded area should be subject to a "proofrolling" and other "special efforts" to identify localized areas of soft or unsuitable soils, which should be removed (R4, tab 156 at GOV 28911). This indicates to us that, given the conditions reflected in the government's data, such localized unsuitable areas were to be expected.

8

C.  What Happened During Contract Performance?

  1.  At the Building Pad

"Clearing and grubbing" (removing vegetation) at the building site began on March 17, 2011 (Bricker rebuttal decl. ¶ 24; R4, tab 289 at GOV 29765).  After that work was accomplished, AGJV's earthworks contractor began preparing the area of the building pad for the foundation.  In general terms, AGJV planned to strip off the first two feet of soil (the soil that had been characterized as soft to firm) and place an amount of "fill" on top of the remaining soil, which AGJV expected to be very firm, as reflected in the boring logs (Graham rebuttal decl. ¶ 14).  To ensure that the soil was, in fact, firm enough to support the foundation, AGJV's contractor performed a "proofing" or "proof rolling" test[12] on May 9, 2011 (Hurt rebuttal decl. ¶ 6).  The soil failed that test (*id.*; app. supp. R4, tab 78 at APP 638).  Photos and undisputed testimony provided by AGJV show that the earth was, in fact, a wet mess and anything but firm (*see* Hurt rebuttal decl. ¶ 11; app. supp. R4, tab 140).  An ECS employee on site was able to insert a metal rod approximately 18 inches into the soil with ease (app. supp. R4, tab 141 at APP 2578).  Mr. Robert Hurt (AGJV's project superintendent on the site) reported in a contemporaneous email that about half the soil at the building pad location needed to be excavated an additional one or two feet and replaced with fill (app. supp. R4, tab 140 at APP 2566).

The government, through Mr. Karl Hren's declaration, alleges that there was a reason for that:  AGJV did little to protect the excavated area from the elements[13] (*see* Hren decl. ¶ 20).  In rebuttal, Mr. Craig Bricker, who was AGJV's quality control manager for much of the project, alleges that, actually, AGJV's subcontractor did perform grading of the site to promote proper drainage (*see* Bricker rebuttal decl. ¶ 27).  A problem, however, with Mr. Bricker's observations is that he was assigned to a different project from March 22, 2011 to July 8, 2011 (*see* Bricker rebuttal decl. ¶ 3), which means that his discussions about matters at this time are not based on first-hand knowledge.  Mr. Hurt testified in his declaration that, although he could not "recall all of the specific details of the construction of the Project on a daily basis," he did recall

_____

[12] A "proofing" or "proof rolling" test involves rolling a loaded piece of equipment over the soil to identify unsuitable or unstable soils (*see* R4, tab 156 at GOV 28911).

[13] The government also provides the declaration of Mr. Joshua Wustner, the Navy's on-site engineering technician, who provided his first-hand observations of drainage and other issues at the site (*see* Wustner decl. *passim*).  But Mr. Wustner, as AGJV points out, was not assigned to work on the project until December 2011 (*see id.* ¶ 1), hence his observations would not be pertinent to the spring and summer of 2011 when issues arose for the area of the building pad.

9

the standard operating procedure used by Grimberg when he was with the company and that would have included grading the site to drain and constructing a berm to divert water from the site as well as using a hose to pump out any water (Hurt rebuttal decl. ¶¶ 8-9). Indeed, the berm and hose may be seen in a photograph, dated March 23, 2011, attached to Mr. Hurt's declaration (*id.* ¶ 10).[14] AGJV further states in its proposed findings of fact that its procedures also called for using a plastic tarp to cover the site at night or when it rained and that, in fact, it did so—pointing to a small white bundle in two of the accompanying photographs of the site that is supposedly the tarp (*see* app. br. at 76-77 (¶¶ 219-20)). This assertion of counsel is completely unsupported: the two declarations cited by AGJV (the Hurt Rebuttal Declaration and the Bricker Rebuttal Declaration, *see* app. br. at 76-77) make no reference to the tarp, much less its being a standard operating procedure; moreover, the white bundle in the photographs (*see* app. br. at 77; duplicating photos at app. supp. R4, tab 140 at APP 2567, APP 2572), if it even is a tarp, appears relatively small and the photos are no evidence that it was ever used. We reviewed government quality control logs from March 2011 through July 2011 and, notwithstanding AGJV's grading or other efforts, see multiple instances of the site being wet and unworkable after heavy rains (R4, tab 289 at GOV 29766-69) and no indication of tarps or other such implements being utilized (*id.*). AGJV's daily reports likewise, generally show a number of instances of the site being too wet to work at and make no indication of the use of tarps (app. supp. R4, tab 78, *passim*).

2. The Parking lot and Roadway Areas

AGJV's excavation contractor encountered similar problems with the excavation for the parking lot and roadways. As early as April 6, 2011, AGJV reported to the government that it was encountering unsuitable soils during its roadway excavation and needed to temporarily halt its excavation activities on the site (app. supp. R4, tab 137). By April 29, 2011, AGJV's project manager, Mr. Joseph Duda, reported in an internal email that the company had decided that the problem with the access road could be temporarily remedied by use of geotextile and stone and that "[b]y summertime, these soils should dry out and be more suitable for use as contemplated in the soils report" (app. supp. R4, tab 139).

On June 23, 2011, Mr. Hurt sent an email to Ensign Seth Jones, the contracting officer's technical representative (COTR), reporting that the soil in the roadway had too high a moisture content and that AGJV would need to bring in structural fill for use on the roadway (app. supp. R4, tab 145). On July 28, 2011, Mr. Duda sent an

---

[14] Although Mr. Hurt does not state as much, that same photograph, taken just a few days after the clearing and grubbing operations began, shows a greatly disturbed landscape (Hurt rebuttal decl. ¶ 10), as one might expect, given the work recently done to remove the trees and shrubbery that had been present.

email to Ensign Jones about the excavation in the parking lot area, reporting that AGJV had done its rough excavation over a month earlier and allowed the area to dry, but that it still had too high a moisture content, requiring further undercutting of the excavated area and bringing in more structural fill (app. supp. R4, tab 150 at APP 2626).[15]

The record does not indicate any further significant issues in the excavation until almost a year later, in May 2012, when AGJV's subcontractor was working on the site entrance and connection to the nearest local road (Benson Road). According to an HCEA field report, on May 11, 2012, after the excavation subcontractor, Jimmy Richards, had cut the eastern half of the site entrance area to subgrade elevation, HCEA, performed a proof roll which revealed "unstable areas." Just as ECS had used a probe near the building foundation in the prior year. HCEA used one at this location for the unstable areas and found it was able to penetrate 8 to 20 inches. (App. supp. R4, tab 283 at APP 3526) The HCEA notes don't directly say so, but it appears that the worst of it was in the first 15 feet of the entrance road, which HCEA recommended be cut an additional two feet and filled with river gravel, while the remaining 115 feet of this portion of the road was recommended be cut only an additional one foot and filled with river gravel (id.).

The record does not reflect what efforts, if any, were used to dry the Benson Road entrance area between the time that Jimmy Richards cut it in the first instance and HCEA proof rolled it. A May 17, 2012 proof-rolling of the parking lot area performed by HCEA found "[a] few areas" that were unstable due to recent rainfall and due to ponding occurring in the area. HCEA recommended that Jimmy Richards drain the area, which it did, and it was able to pass the proof-rolling the next day.[16] (App. supp. R4, tab 283 at APP 3527-28)

---

[15] At some point, about the time that differing site conditions issues first came to a head, AGJV changed both its earthwork subcontractor and its supervisory geotechnical subcontractor. Its original excavation subcontractor was "Division 2" (see, e.g., app. supp. R4, tab 78 at APP 529), but no reference of that company is made after July 8, 2011 (see id. at APP 711). "Jimmy Richards", which was involved from the beginning of the project (see, e.g., id. at APP 546) is the excavation contractor we see discussed moving forward (id. passim). Likewise, the geotechnical subcontractor, ECS, which last appears in AGJV's daily logs on June 24, 2011 (id. at APP 704), seems to have been replaced by Hillis-Carnes (also referred to as HCEA) by June 27, 2011 (id. at APP 706). The record does not reflect why these changes were made.

[16] There appears to be some disconnect on the date because there are two HCEA reports dated May 17, 2012, but they appear to be discussing matters that happened a day or two apart (see app. supp. R4, tab 283 at APP 3527-28). We do not perceive this to be a significant issue.

11

On May 31, 2012, work on the western side of the road entrance is alleged to have encountered similar problems to those on the eastern side of the road entrance: after cutting the area two feet, Jimmy Richards was advised by HCEA to cut another foot to remove unsuitable material that remained (app. supp. R4, tab 283 at APP 3663).[17]  Oddly, AGJV's own daily report for this date notes that the "2 foot cut was determined to reach solid ground" (*id.* at APP 3648), which suggests that the two-foot cut had reached suitable soils.  Whatever the case, by email sent that day, Mr. Bricker notified Ensign Jones that AGJV had encountered a differing site condition at the west side of the entrance and that AGJV would proceed as directed by its geotechnical consultant unless directed otherwise (*id*. at APP 3640-41).  In response, Ensign Jones stated that the Navy did not consider there to be a differing site condition but directed AGJV to remove any unsuitable soil and replace it with suitable fill as required by the contract (*id*. at APP 3640).

AGJV does not appear to have alleged any other differing site conditions beyond those discussed above.

D.  Evidence About What AGJV may Have Done to the Condition of the Site

The Navy has submitted evidence, primarily through a declaration by Mr. Joshua Wustner, who was the Navy's on-site engineering technician, that AGJV did a poor job controlling the wet conditions on the site (*see generally* Wustner decl. ¶¶ 6-11).  Mr. Wustner who, it should be noted, did not become involved with the project until December 2011 (*see id*. ¶ 1), asserted that the site was lacking in ditches, mounds, and dikes that would have helped abate the watering issues (*id*. ¶ 9).  Mr. Wustner also discussed the concurrence of geothermal well drilling on site (which used a drilling fluid that created a slurry) made for a "soupy mess everywhere" (*id*. ¶ 7).  Other excavations on the site for utilities only added to the disturbed soil (*id*. ¶ 8).  According to Mr. Wustner, he remembers returning to his office from the site often during the winter and spring of 2011-2012 and tracking in muck and mud (*id*. ¶ 7).  Mr. Wustner also makes the point that the entry road had been used throughout construction by *all* the trucks and heavy equipment entering and leaving the site prior to the proof roll failures in December 2011 and May 2012 so the soil there had been significantly disturbed by AGJV (*id*. ¶ 5).

AGJV, needless to say, does not think very highly of Mr. Wustner's testimony and offered multiple declarations in rebuttal to him.  Mr. Hurt's rebuttal declaration discusses the geothermal wells being dug in November and December of 2011, meaning that they could not have been at issue for the building pad (Hurt rebuttal decl.

---

[17] HCEA, in fact, noted saturated soils, with deep ruts from contractor trucks the previous day (app. supp. R4, tab 283 at APP 3662).

¶ 13). But Mr. Wustner does not allege that they were related to the building pad problems, which occurred well prior to his involvement in the project.

Mr. Bricker provided a far more extensive rebuttal declaration challenging Mr. Wustner's testimony (*see* Bricker rebuttal decl. *passim*). Mr. Bricker first takes issue with Mr. Wustner's statement that he observed a proof-roll failure at the main entrance in December 2011 (*see id*. ¶ 7 (citing Wustner decl. ¶ 6)). According to Mr. Bricker, there was no proof roll test at the main entrance until May 11, 2012 (*id*. ¶ 8). More significantly, Mr. Bricker states that Mr. Wustner was wrong to allege that the problems with the main entrance were caused by its use for construction traffic since the "outbound" side of the entrance, where the most problems were encountered, was not used by construction traffic, (*id*. ¶ 12) though, presumably, that meant that the "inbound" side of the entrance was. Mr. Bricker further states that the geothermal wells (drilled several months before the problems with the entrance were encountered) were far enough away from the entrance not to have caused an issue with it (*id*. ¶¶ 14-17). He also stated that the utility trenches, which Mr. Wustner had identified as a contributor to soil instability along with the geothermal well drilling (*id*. ¶ 21 (citing Wustner decl. ¶ 10)), were far from the site of the geothermal wells (*id*. ¶ 21) and only "to the right" of the outbound lane and "away from" the cut area for the entrance (*id*. ¶ 26). In general, the excavations identified by Mr. Wustner were, according to Mr. Bricker, performed several months before the cut on the main entrance (*id*. ¶ 25). Mr. Bricker also takes issue with Mr. Wustner's statements that broken water lines had flooded the property on numerous occasions (*id*. ¶ 28 (citing Wustner decl. ¶ 26)). Mr. Bricker conceded that AGJV's subcontractors had damaged government property two or three times, but did not recall a broken water line flooding the site (*id*. ¶ 28).

As a matter of fact finding, we find Mr. Bricker's statements of fact generally credible, but their effect on the general issues raised by the Wustner testimony is limited. With respect to the divergence in dates for the proof roll failure at the entrance, we have reviewed AGJV's and the government's contemporary quality control reports for that time period and found that they reflect compaction testing by AGJV's geotechnical contractor on December 22, 2011 and many other days throughout the late December/early January 2022 time period, but no proof rolling at the entrance in December 2011 (*see, e.g.*, R4, tab 289 at GOV 29782; app. supp. R4, tab 78, APP 939, APP 941, APP 943, APP 949, APP 958, APP 960, APP 970). This is not a particularly significant issue and very little of the Wustner declaration rests upon it. We have looked at the location of the geothermal wells as denoted in the photographs accompanying Mr. Bricker's rebuttal declaration (*see* Bricker rebuttal decl. ¶¶ 18-20) and compared them to the best general map of the construction site that we have found in the record (R4, tab 9 at GOV 1011) and agree that the geothermal drilling sites seem to be some distance from the entrance road. Does that mean that the slurry from the geothermal drilling would have had no effect on the entrance road? Perhaps not, but Mr. Wustner does not allege that it did; merely that it contributed to

the general mess of the site. Of far greater importance is the status of the cut at the entrance road. We have also looked at the entrance and exit roads depicted in the map of the construction site and they are adjacent to each-other (*see id.*), and we have little faith that construction equipment traversing the entrance road to and from the building site would limit itself completely to the "inbound" side of the entrance, much less that it would leave this adjacent area undisturbed. Moreover, the utility trench adjacent to the outbound lane of the entrance ramp is another clear source of disruption for nearby soils. We have also reviewed the daily reports and find three or four incidents of AGJV or its subcontractors striking pipes that subsequently disgorged water into the site (*see* app. supp. R4, tab 78 at APP 608-09 (April 18, 2011 water main strike); tab 78 at APP 676 (June 6, 2011 water line strike); R4, tab 289 at GOV 29767 (same); R4, tab 289 GOV 29768 (June 24, 2011 broken fire hydrant); app. supp. R4, tab 78 at APP 7510-51, 753 (August 8, 2011 sewer line broken, continued leaks the following day); R4, tab 289 at GOV 29772 (same)). Ensign Jones, the COTR, discusses all of these incidents in detail in the declaration he submitted for this appeal, and his narrative description leaves little doubt that these incidents significantly disturbed the soil (*see* Jones decl. ¶ 15). The evidence, then, is consistent with a finding that, regardless of the fine details, AGJV's subcontractors did not do a particularly good job of keeping the ground dry and undisturbed, and the soils, in particular, at the entrance, took a beating.

### E. What the Parties' Respective Experts Have to say

The government has provided the expert testimony of Mr. Karl Hren (mentioned in section III. A. 2. above). Mr. Hren, a Professional Engineer (P.E.) is a NAVFAC employee whose job for the six years prior to executing his declaration for this appeal was to be an in-house geotechnical expert for the Navy (Hren decl. ¶¶ 1-2). He received a masters degree in geotechnical engineering from the University of Florida in 1994 and has been working in the field ever since (*id*. ¶¶ 1-3). AGJV has made no objection to his being considered an expert and we consider him to be an expert in the field of geotechnical engineering.

Mr. Hren's bottom line is that, based upon the soils reflected in the borings, what happened at the site was AGJV's fault and it should have known what to expect (Hren decl. ¶¶ 21-22). We will break this down somewhat.

First, Mr. Hren discussed the nature of the soils reflected in the boring logs. As discussed above, he characterized the top four feet of the site as fine-grained, CL, ML, or CH (Hren decl. ¶ 15). These soil types, Mr. Hren explained "are generally recognized in the construction industry as being more difficult types of soils in which to control moisture and allow recompaction once disturbed" (*id*.). Mr. Hren makes the further observation that AGJV has presented no evidence that the soils were anything but what the boreholes said they would be (*id*. ¶ 16). Though we, of course, are the

14

ultimate arbiters of what AGJV proved and didn't prove, we take this portion of Mr. Hren's testimony to mean that the evidence presented by AGJV of the field conditions was not inconsistent with the borehole records being an accurate representation of the conditions of the site when they were taken.

Mr. Hren also testifies that his review of the daily reports showed that AGJV had "repeatedly disturbed the soil and allowed rain water and water from broken underground water lines at or near the site to saturate the soil" (Hren decl. ¶ 16). His view of the effect of the geothermal drilling fluid that was on the site near the wells was that it contributed to water retention and thus weakening of the soil (*id*.).

Mr. Hren addresses AGJV's contention that, after it stripped the top layers of the soil, the remaining soil should have been strong enough to support the construction. He states that this would only be true if the soil were as stiff as AGJV stated it was (which Mr. Hren found to be an exaggeration of the boring reports) and if the soils had been immediately protected after clearing and grubbing and that existing soils had been protected from rainwater and other site activities that would have weakened them. (Hren decl. ¶¶ 19-20)

We recognize that, as a Navy employee, Mr. Hren has reason to be biased in favor of the Navy, and take that into account when weighing his testimony. Nevertheless, we find that his testimony is consistent with what we have observed in the record, the recommendations made by AGJV's original geotechnical consultant, ECS, and our review of the boring records. We thus find him to be credible.

AGJV does not present any expert testimony, *per se*, but does present the testimony of its estimators and personnel on site to rebut the factual bases of Mr. Hren's testimony. Mr. James Graham, a professional engineer licensed by the state of Maryland with more than 40 years of experience in construction and a principal of Grimberg was the estimator for the project (Graham rebuttal decl. ¶¶ 2-9). He testified that based upon the geotechnical data provided in the RFP, AGJV expected that it could remove the top two feet of soil on the site, which would leave soil suitable for proof rolling (*id*. ¶¶ 12-14). Mr. Graham further discussed the soils near the roadway entrance, explaining that the inbound lane passed the proof rolling testing but the outbound lane did not (*id*. ¶18). He then explained that, based on the single boring taken near the entrance, he had expected to need to excavate only two feet, down to the 106.8-foot subgrade, but, instead, was required to excavate down to the 105.12-foot subgrade.[18] (*Id*. ¶¶ 20-21) Although his declaration is characterized as a rebuttal of Mr. Hren's (and others') (*see id*. ¶ 1), Mr. Graham does not directly address any of Mr. Hren's conclusions or statements of fact.

---

[18] This is approximately 1.7 feet deeper.

Mr. Hurt's rebuttal declaration also purports to refute Mr. Hren's testimony (*see* Hurt rebuttal decl. ¶ 1), but does not address his contentions directly. Instead, it makes the point that Mr. Hren was not at the site (*id*. ¶ 6) and remarks that the geothermal drilling occurred long after the problems were encountered at the building pad (*see id*. ¶ 13). As discussed above, Mr. Hurt also explained the general approach to dewatering and protecting excavations that he performed while working for Grimberg and that he believed were done on the site in question (*id*. ¶¶ 8-10).

Mr. Duda (previously identified as AGJV's project manager) provided a rebuttal declaration that made the point that the geothermal wells were installed long after the building pad (*see* Duda rebuttal decl. ¶ 4), but made no other challenge to Mr. Hren's testimony.

### F. AGJV Submits and the CO Denies a Differing Sites Condition Claim

On February 15, 2013, AGJV submitted a request for equitable adjustment (REA) to the contracting officer (CO) seeking $294,305 in increased costs due to unsuitable soils. The REA explicitly provided that it did not seek delay damages, which would be sought in a separate REA. (R4, tab 533 at GOV 31768) The parties have not pointed to any government response to this REA and on December 15, 2016, AGJV submitted a certified claim to the CO seeking $185,096 in costs incurred due to differing site conditions related to the soil at the building pad and the west and east sides of the Benson Road connection to the building (R4, tab 575 at GOV 32892, 32894-96). Like the REA, this claim reserved the right to seek delay damages at a later time (*id*. at GOV 32897). Nevertheless, there is no evidence of a further claim seeking delay damages based upon the alleged differing site conditions. On July 14, 2017, the CO issued a summary decision denying the claim in its entirety (app. supp. R4, tab 285).

AGJV timely appealed this decision to the Board and we docketed it as Appeal No. 61252.

### IV. AGJV Wants to Work Extra Hours, Including Weekends; the Navy Only Gives it Some of What it Wants

Though it does not appear that site issues appreciably delayed the project (AGJV never having made a delay claim based upon differing site conditions), by late 2011 / early 2012, it was clear to AGJV that it was running behind schedule and would have difficulty completing the project before its completion date. As we discuss in more detail below, AGJV sought the government's permission to work beyond the usual hours set forth in the contract (something the contract permitted it to request and the CO to grant), but the Navy denied its blanket requests for weekend work even though the Navy did permit extra hours of work during the week and work on a

16

handful of Saturdays.  AGJV would ultimately claim this denial of blanket work hour extensions to be a breach of contract, pursued here in Appeal No. 61402.

A.  Contract Provisions Governing Working Hours

There are two clauses governing the working hours in the contract. Specification 1.2.2., Working Hours, provides:

> Regular working hours shall consist of an 8 ½ hour period established by the Contracting Officer, between 7 a.m. and 3:30 p.m., Monday through Friday, excluding Government holidays.

(R4, tab 4 at GOV 104)

And the relevant portion of Specification 1.2.3, Work Outside Regular Hours, provides:

> Work outside regular working hours requires Contracting Officer approval.  Make application 15 calendar days prior to such work to allow arrangements to be made by the Government.  Based on the justification provided, the Contracting Officer may approve work outside regular hours. . . .

(R4, tab 4 at GOV 104)

B.  Evidence Presented by ACJV About its Experience With Similar Clauses in Other Contracts (and Limitations on That Evidence)

Working hour provisions in a government contract are not unique. Mr. Grimberg explained in his declaration that similar provisions existed in other government contracts that his company had performed and he specifically cited to three of them involving the Navy during approximately the same time period (*see* Grimberg decl. ¶¶ 13-14).  Mr. Grimberg has reproduced the working hours sections of these contracts and, in some ways, they are quite similar to the present provisions, but, in others, somewhat different (*see id*. ¶ 14).

The first contract cited by Mr. Grimberg, "the Explosives Contract" varied from the contract here because it had slightly different working hours, a shorter period for requesting authority to work outside the hours, and a comprehensive list of information required to be provided in the request (*see* Grimberg decl. ¶ 14 a.).  We do not consider these differences to be material to the dispute here.

17

The second contract cited by Mr. Grimberg, "the Buildings 3 & 5 Contract" at the Naval Medical Center at Bethesda, MD, awarded in September 2010 and performed during the same time period as the contract here (*see* Grimberg decl. ¶ 13 b.) differed more significantly, including not only the 8 1/2 -hour period for Mondays through Fridays, but also 7 a.m. through 11 p.m. on Saturdays.  Hours outside of these times required a request 20 days beforehand.  (*See* Grimberg decl. ¶ 14 b.)  The inclusion of two full shifts for Saturday is, to us, a material difference.

The final contract cited by Mr. Grimberg, "the Dahlgren contract," provided that regular working hours would be for 8 1/2  hours Monday through Friday.  The section dealing with hours outside of regular hours was similar to that in the present contract, but did not include the phrase stating that, "[b]ased on the justification provided, the Contracting Officer may approve work outside regular hours." (*See* Grimberg decl. ¶ 14 c.)

Mr. Grimberg testified that, based on his many years of government contracting experience (and the Board agrees that his experience has been substantial (*see* Grimberg decl. ¶¶ 2, 4)), he expected that the Navy would exercise its discretion to allow work outside of regular hours "reasonably, as it had done previously" (*id*. ¶ 18). He further stated that, based upon this experience, AGJV bid upon the contract, with the expectation that the Navy would reasonably exercise its discretion to allow work outside of regular hours (*id*. ¶ 19).

Although it is certainly possible that its experience with other unspecified contracts informed AGJV's bid with respect to the working hours issue, we find it unlikely that AGJV's experience with the three contracts specified in Mr. Grimberg's declaration did.  That's because of their dates.  Recall that the contract was awarded on September 30, 2009.  According to the exhibits attached to Mr. Grimberg's declaration, the RFP for the Explosives Contract was issued on May 19, 2008 (Grimberg decl., ex. 1 at 1).  We do not know when the contract was awarded or work begun, but it was plainly some time after its RFP was issued.  For the Buildings 3 & 5 Contract, the exhibit attached to Mr. Grimberg's declaration indicates that it was issued on June 21, 2010 (Grimberg decl., ex. 2 at 1), almost a year *after* contract award in our case.  And for the Dahlgren contract, the exhibit attached to Mr. Grimberg's declaration, the specifications are dated February 25, 2013 (Grimberg decl., ex. 3 at 2) and forwarded to John Grimberg, Inc. on April 1, 2013 (*id*. at, 1), several months after performance on the contract here was concluded and years after the submission of AGJV's bid.  Thus, with the possible exception of the Explosives Contract, it was a temporal impossibility for AGJV's experience with the identified contracts to have informed its bid on this contract.

We also note that Mr. Grimberg has not identified in what way and with any specifics the manner in which the Navy "reasonably" exercised its discretion in prior

contracts, leaving us with no indication of how those exercises in discretion would compare to the Navy's actions in the case before us.

In addition to Mr. Grimberg's declaration on this subject, AGJV presents the rebuttal declaration of Mr. Graham, whose role as an estimator we have already discussed above for the differing site conditions issue. Mr. Graham stated that, other than this project, he did not recall any other project performed at the same location for the Navy in which requests to work outside the regular working hours were routinely denied (Graham decl. ¶ 16). This declaration is of limited utility to us because we have no idea how often such requests may have been made or how their circumstances would have compared to those in this contract.

C. AGJV Makes a Standing Request to Work Outside Regular Hours; the CO Largely Denies it, but Gives AGJV Partial Relief

The first mention of working outside regular hours in the record (at least as identified in AGJV's brief, (*see* app. br. at 32)) is an email from AGJV to the Navy, dated July 20, 2011, seeking permission to work Saturday July 23, 2011 from 6 a.m. to 4 p.m. (app. supp. R4, tab 147 at APP 2622-23). The Navy denied that request, stating that it was the Navy's "understanding that the nature of the work to be performed is not unusual or extraordinary and can be completed during normal working hours, Monday thru Friday" (*id.* at APP 2622). The next time this issue arose in the facts brought in this appeal[19] was in a discussion held between the parties on October 5, 2011 and reflected in meeting minutes kept by AGJV in which AGJV was reminded that the coming Monday was Columbus Day, a federal holiday, and if AGJV wished to work on site that day, it would have to request it to the CO and "demonstrate gov benefit" (app. supp. R4, tab 33 at APP 157). AGJV has pointed to no evidence, and we have seen none, about whether this was, in fact, requested and whether it was granted.

On January 4, 2012, AGJV informed the Navy that it intended to begin requesting work on Saturdays "after the holidays"[20] (app. supp. R4, tab 44

---

[19] As will be discussed below, AGJV's certified claim on this matter gave greater emphasis to events that occurred in the spring and summer of 2011 (R4, tab 88 at GOV 1595-96), but the earlier dates are not the focus of the facts presented by AGJV today (*see* app. br. at 32-44).

[20] The meeting minutes prepared by AGJV for January 18, 2012 suggest that this statement was made at the preceding meeting, December 28, 2011, and that during the January 4, 2012 meeting AGJV stated it would submit a justification for the request (app. supp. R4, tab 46 at APP 229). This is consistent with the "after the holidays" statement in the January 4, 2012 minutes, but the minutes

19

at APP 216). Reference to the issue was made in the January 18, 2012 meeting minutes (*see* app. supp. R4, tab 46 at APP 229). Later meeting minutes reflect that, at the January 18, 2012 meeting, AGJV, in fact, formally requested "to work every Saturday from here until the end of the job" (app. supp. R4, tab 47 at APP 236) and that the Navy rejected it on January 25, 2012, the following week, stating that "a cost/benefit analysis was performed on the cost of the Navy working overtime vs the need for the delivery dates of the building" (app. supp. R4, tab 48 at APP 244).

The same day as that rejection, AGJV submitted a revised completion schedule to the Navy and implored it to allow work on Saturdays and "extended hours"[21] despite its earlier rejections (app. supp. R4, tab 86 at APP 1789-90).

More discussions followed the January 25, 2012 rejection. Meeting minutes reflect requests for "after hours" or "off hours"[22] work made by AGJV on February 1, February 15, February 22, and February 29. All were denied. On March 7, 2012, apparently reflecting the Navy's explanation, the minutes stated "[n]ot available to anyone. Has to be approved by the Navy Yard." According to the minutes, on March 28, 2012, the Navy conveyed that "there is going to be no change on this." (App. supp. R4, tab 56 at APP 311)

The next significant discussion about after hours work is reflected in the June 6, 2012 meeting minutes in which AGJV wrote: "We would still like to continue requesting Saturdays as we have been – it would be a big help. We would even be willing as we have previously stated, to pay for Navy personnel who need to be here" (app. supp. R4, tab 64 at APP 396). At this meeting, though refusing to permit Saturday work, the Navy agreed to extend the work period on Mondays through Fridays 6:30 a.m. to 6:30 p.m. (app. supp. R4, tab 65 at APP 402). This extension of workday hours actually appears to have been permitted much earlier—starting in January 2012. According to an internal Navy email relied upon by the government's scheduling expert, Mr. David Reichard, AGJV averaged 10-11 hour

---

of the December 28, 2011 meeting make no mention of it (*see* app. supp. R4, tab 43).

[21] "Extended hours" was not defined in the letter, but the proposed completion schedule attached to this letter included approximately a month of "night shift" work on drywall installation (*see* app. supp. R4, tab 86 at APP 1791)

[22] Exactly how much "after hours" or "off hours" work AGJV was requesting is not immediately clear from the record (except for the drywall installation "night shift" discussed above), especially compared to the Saturdays it was more explicitly and concretely requesting.

days in February through May of 2012, with the average dipping to 8-10 hours in the June-July time period (Reichard Report at 41).[23]

On three occasions in 2012, moreover, the Navy did allow work on Saturdays, apparently because it involved utilities:  February 4, February 11, and September 29 (app. supp. R4, tab 293 at APP 4823-24, APP 4851-54, APP 5700-03).

Although, as noted above, AGJV did take advantage of some of the extra weekday hours offered by the Navy (*see also* Gannon decl. ¶ 5), it generally found this to be an unsatisfactory solution.  According to AGJV, construction workers tend to be less efficient during 12-hour days due to fatigue, so the gains in hours are offset by the loss in productivity (Grimberg decl. ¶¶ 33-35; Duda decl. ¶¶ 43-45; Greenwell decl. ¶¶ 41-42).  In the meantime, according to AGJV, one of the advantages of working two full shifts in a day is that the worksite can be less crowded so that workers for one trade will not get in the way of workers for another (Grimberg decl. ¶ 36; Duda decl. ¶¶ 46-47; Greenwell decl. ¶¶ 43-44).

The Navy does not challenge the evidence that workers are not as efficient in a 12-hour shift as in an 8-hour shift, nor does it disagree that a less crowded construction site might be more efficient.  Upon consideration of the evidence, then, we do find that workers in sustained 12-hour shifts are likely not as efficient as they are in shorter shifts.  On the other hand, we do not believe the 12 hours of availability was a completely empty gesture by the Navy:  AGJV took the opportunity to use at least some of the extra available time and presumably did so for a reason.

We also note that some of AGJV's declarations included a demonstrative table purportedly showing that the Navy only permitted it to work five shifts a week, when, in fact, a week properly contained 14 potential shifts if only the Navy had permitted two shifts a day, seven days a week (*see, e.g.*, Duda decl. ¶ 41; Greenwell decl. ¶ 38; *see also* Grimberg decl. ¶ 29 (making same point in text without the table)).  We find this table to be misleading.  AGJV *never* requested to work on Sundays, nor two shifts on Saturdays.  Moreover, AGJV has not provided any evidence that it and its subcontractors had the wherewithal to staff an effective tripling of the number of hours worked by qualified employees on the project.  Indeed, AGJV has provided no evidence of how many shifts it could or would have filled if the Navy had allowed it more access.

---

[23] Mr. Reichard's report was submitted with the government's declarations in accordance with our scheduling order.

D.  The CO's Justification for not Granting AGJV all it Requested

The decision about whether to approve extra work hours was made by Ms. Linda Atchinson, the Navy Administrative Contracting Officer (ACO) (*see* Atchinson decl. ¶¶ 19-26).  Ms. Atchinson made the decision to mostly disapprove the request based upon the advice of her engineering staff, but also based upon a personal visit she made to the site (*id*. ¶ 23).  She described her decision-making to be based upon a balance of the benefit to the project compared to using the "limited resources we had for surveillance, especially after hours or on weekends" (*id*. ¶ 21).

According to Ms. Atchinson, her visit to the worksite led her to question whether AGJV would use any additional time in a productive way because there was no work going on at all when she arrived (Atchinson decl. ¶ 23).[24]  She also saw no increase in productivity in the weekend days that she did permit or in the extra weekday hours granted (*id*. ¶ 24).  Mr. Patrick Gannon, who supervised the Navy's engineering team from the project (Gannon decl. ¶ 1), confirmed Ms. Atchinson's impression, noting that on one Saturday that AGJV was permitted to work the company was unprepared for it (Gannon rebuttal decl. ¶ 6).

Against what she considered uncertain benefits to the Navy, Ms. Atchinson weighed the costs to the Navy.  The Navy's experience with AGJV's subcontractors cutting utilities and doing other damage to the site convinced the Navy that it needed to have a construction manager or engineering technician on site during the extra hours (*see* Gannon decl. ¶ 5; Gannon rebuttal decl. ¶ 5; *see also* Jones rebuttal decl. ¶ 5 (tying extra hours issue to concerns about need for supervision); Atchinson decl. ¶ 26 (expressing Navy concern for "safety and security at the project site")).  With that in mind, Ms. Atchinson and Mr. Gannon considered the practical issues of getting personnel to work the added hours.  In the first place, Mr. Gannon's office was relatively short staffed at the time (Atchinson decl. ¶¶ 22; 25).  Moreover, providing such a supervisor would require working overtime, which was controlled by "NAVFAC"[25] in Washington, DC and was "generally only approved for emergency situations to avoid mission impacts" (Gannon decl. ¶ 4).  One example Mr. Gannon provided was for matters involving utility outages (*id*. ¶ 4).  Although AGJV did offer

---

[24] Mr. Greenwell provides testimony that, at the time in question, the workers were on a scheduled break (Greenwell rebuttal decl. ¶ 14).  We suspect an experienced ACO would recognize a short break for what it was and, though we doubt Ms. Atchinson's experience of finding nobody working on the site was the norm, we also suspect that she truly did encounter a day of less than full utilization of the potential workforce and understand why that would color her perceptions of AGJV.

[25] We presume this is the same as "the Navy Yard" mentioned in the meeting minutes discussed above.

to pay for the overtime, fiscal law does not permit this, so it was not a viable option (*id*. ¶ 5).

Ms. Atchinson summed up her thinking:

> In addition to the fact that I really did not have the staff to be able to supervise AGJV on Saturdays, there was no reason, based on their performance, to believe they would be more productive if they were allowed to work Saturdays.

(Atchinson decl. ¶ 25)

### E. AGJV Files a Claim on the Work Hours Issue

On August 2, 2017,[26] AGJV submitted to the CO a certified claim, dated July 31, 2017, seeking a decision that the Navy's denial of AGJV's requests to work outside of regular work hours was a breach of contract (R4, tab 88). The claim alleges the Navy's refusal to allow work outside of regular hours began in the spring and summer of 2011 (*id*. at GOV 1595). In addition to seeking a return of the $199,500 that the Navy continued to hold in liquidated damages for the delayed completion of the project, AGJV also indicated that it would seek delay damages "under a separate cover" (*id*. at GOV 1605). No such follow-up claim appears to have been submitted.

The Navy did not decide this claim within 60 days, and on November 2, 2017, AGJV appealed this "deemed denial" to the Board. It has been docketed as Appeal Number 61402.

### V. Redesign and Delays With the Fire Sprinkler System

Appeal Nos. 60428 and 60691 involve claims regarding the fire sprinkler system. AGJV alleges that it was forced to perform additional water flow tests; that the results of those tests necessitated re-design of the system and additional costs; and that the government imposed other unnecessary requirements upon it for the fire sprinkler system.

---

[26] The August 2, 2017 submittal date is not reflected in the record cited by AGJV, but it is alleged in the paragraph 5 of AGJV's complaint in this appeal and conceded in the corresponding paragraph of the Navy's answer.

23

A. The Contractual Requirements

The RFP includes Section D40, Fire Protection, which requires the installation of an integrated fire alarm and suppression system (R4, tab 5 at GOV 438). The section requires that all design documents and calculations for it be prepared by, or under the supervision of, AGJV's Qualified Fire Protection Engineer, the Fire Protection Designer of Record (FPDOR) (*id.*).

Subsection D4020, Fire Suppression Water Supply and Equipment, includes water pressure and flow rate figures that the contractor was directed use in performing its hydraulic calculations (R4, tab 5 at GOV 439). Section D4040, Sprinkler Systems, requires that the contractor perform "a minimum of two fire flow tests in order to obtain data for hydraulic calculations" necessary for the sprinkler design,[27] with the CO to provide the location for these tests (*id.*).

The design-build specifications in the Performance Technical Specification (PTS) on this matter provide further detail (R4, tab 6 at GOV 663). PTS Section D 40, subsection 1.3, Design Submittals, specified that design submittals would be made in accordance with Section Z10 of the PTS, UFGS[28] section 01 33 10.05 20, *Design Submittal Procedures,* UFC[29] 1-300- 09N, *Design Procedures*, and UFC 3-600-lON, *Fire Protection Engineering* (*id.* at GOV 666).

B. AGJV Hires a Fire Protection Designer of Record and Also a Subcontractor to Install the Fire Sprinkler

On December 7, 2009, AGJV entered a contract with Alphatec, P.C. (Alphatec), to provide architect/engineering (A/E) services for the project, including designing the fire alarm and sprinkler systems (R4, tab 766-09 at GOV 34662, 34672), with Mr. Steve Bur of Alphatec to be its FPDOR (Bur decl. ¶ 7). Mr. Bur appears to us to possess all the necessary background required for that position (*see id.*, ¶¶ 2-5) and the Navy has not challenged it. We consider him to be an expert witness.

---

[27] It may seem inconsistent for the RFP to provide numbers for "hydraulic calculations" while it also requires new water flow tests for such calculations after contract award. We suspect the seeming inconsistency can be harmonized by recognizing the first figures as being provided to potential contractors for bidding purposes, with the contractor-conducted tests performed after contract award being required to inform the final design in this design-build contract. To the extent the figures in the two sets of tests were different to the disadvantage of the contractor, it could pursue an appropriate remedy.

[28] UFGS is short for Uniform Facility Guide Specification (*see* R4, tab 6 at GOV 749).

[29] UFC is short for "Unified Facilities Criteria" (*see* R4, tab 6 at GOV 746), a set of rules applicable to the Department of Defense.

On December 4, 2009 (just a few days before AGJV formally entered its contract with Alphatec), Mr. Keith Cunningham of National Fire Protection (plainly on behalf of AGJV)[30] performed flow tests on three fire hydrants (*see* R4, Tab 766-10 at GOV 34703-05).[31] Although the contract specified that the CO would select the hydrants to be tested, that does not appear to have happened here. Instead, Mr. Enrique Uribe, then a contract employee for the Navy, who was assigned to observe the water flow tests on behalf of the Navy, showed Mr. Cunningham where the river water mains were, and allowed him to choose the fire hydrants to test. In fact, according to Mr. Uribe (and undisputed by AGJV), Mr. Cunnigham tested on a different set of water mains than those that Mr. Uribe showed him. (Uribe decl. ¶ 4) As explained by the government's expert witness, Mr. Douglas Fisher,[32] of the three different flow tests performed that day, one overperformed the test results contained in the RFP and the other two underperformed it— one, substantially (Fisher Rebuttal decl. ¶ 5; Fisher Report at 7-8).

On February 19, 2010, Alphatec provided a "Design Development" (35% progress) submittal to the Navy for review (Fisher Report at 8). The government made a number of comments on this document, including several relevant to the issues before us, including emphasizing the requirement that the plans provide the name and qualifications of the Design Build Fire Protection Engineer (DBFPE)[33] and that the water supply analysis indicate that the fire flow test had been conducted

---

[30] The government's expert report, dated July 20, 2022, by Mr. Douglas Fisher states that these tests were performed under the direction of Alphatec (Fisher Report at 7). Although Mr. Cunningham does not appear to be an Alphatec employee, there is email traffic preceding the test and discussing it which included Mr. Bur (*see* app. supp R4, tab 120 at APP 2340), which satisfies us that he and Alphatec were, indeed, involved, even if the contract had not been formally awarded yet.

[31] AGJV's proposed findings of fact state that two were performed on December 2, 2009, while one was performed on December 4 (app. br. at 94-95 (¶ 273)). Our review of the documents suggests the better reading is that a test was attempted on December 2, 2009, but was considered unsatisfactory for various reasons (*see* app. supp R4, tab 120 at APP 2339) and that there were, in fact three tests performed on December 4, as reflected by the date affixed to all three test results in the record (*see* R4, tab 766-10 at GOV 34703-05). In the end, though, it does not matter if they were performed on one day in early December 2009 or over two days in the same time period.

[32] Mr. Fisher is a Fire Protection Engineer, licensed by the State of Maryland, is a Fellow in the Society of Fire Protection Engineers, and has 28 years of experience in the field (Fisher Rebuttal decl. ¶¶ 1-2). We consider him to be an expert in the field of fire protection engineering.

[33] We believe the DBFPE was merely the FPDOR by a different name.

under the supervision of the DBFPE (R4, tab 134 at GOV 28785, 28787; Fisher Report at 8-9).  Alphatec submitted subsequent designs and calculations to the government, including a Corrected Final Design package, dated July 8, 2011 (*see* Fisher Report at 9).

Prior to award of the contract, AGJV requested preliminary price quotes from potential fire sprinkler subcontractors, based upon the RFP.  Fire-Mak, Inc. (Fire-Mak) was the lowest bidder.  In early 2011, AGJV provided three of the potential fire sprinkler subcontractors (including Fire-Mak) with drawings and analysis that it had submitted to the government on October 15, 2010 (plainly, prior to the final drawings Alphatec submitted in July 2011), and sought pricing from them.  In early March 2011, Fire-Mak and the other potential subcontractors provided their proposed prices.  After some negotiation, Fire-Mak and AGJV executed a contract on November 11, 2011.  (Fisher Report at 10)

In return for payment to Fire-Mak of $75,000, the contract between the two required Fire-Mak to "Furnish and install [the fire sprinkler system as per the RFP (as amended) and the submissions made to the government by Alphatec] dated 15 October 2010 and all other contract documents as the[y] apply."  This contract also required one hydrant flow test if required by the authority having jurisdiction.  (Fisher Report at 10-11)

C.  The Long Road to Design Approval for the Sprinkler System

The Corrected Final Design package (which appears to have embraced more than just the sprinkler system) was submitted to the government by Alphatec on July 8, 2011.  Of note, this design indicated 3-inch piping for the water sprinkler cross mains, 4-inch piping for the sprinkler system's floor control valve assembly, and 6-inch piping for the sprinkler riser (Fisher Report at 9-10).  There is no indication in the briefing or the record (as far as we can see)[34] indicating that the government had any problem with the sprinkler aspect of this package.

On October 27, 2011, AGJV provided fire sprinkler material data to the Navy.  A little more than a week later, on November 4, 2011, the Navy informed AGJV that it needed Fire-Mak's shop drawings and calculations to complete its review.  AGJV submitted these to the Navy on January 23, 2012.  The Navy rejected the submittal on January 26, 2012.  (Fisher Report, at 2)

---

[34] Needless to say, given the size of the record, just because we have not found an item does not mean that it does not exist even though we have performed some independent review of the Rule 4 file and its supplements.  It is incumbent on the parties to direct us to matters they wish us to consider, and if they do not do so, they have no basis to complain.

The Navy's rejection of the submittal included twelve comments, six of which would have been sufficient to justify the rejection (assuming they were proper). Relevant to the issues before us, comment d required "a hose connection at the roof as indicated on NFPA 14 Section 7.3.2. (5)" (Fisher Report at 13). Also relevant to us, comment k stated, "[p]lease update the flow test as it is more than 2 years old" (*id.*).

In its February 10, 2012 response to the Navy's rejection, AGJV argued that the hose valve should not be required for the roof because the building had a stair enclosure with access to the roof and that the top landing of that stair enclosure had a hose valve. AGJV argued that the 2010 edition of NFPA 14 had clarified that only one standpipe was necessary to service the roof. (Fisher Report at 13) The relevant portion of the NFPA from 2007 (which the contract required AGJV to hew to) provides:

> **7.3.2 Class I Systems.** Class I systems shall be provided with 2 ½ in. (65 mm) hose connections in the following locations:
>
> -- -- --
>
> (5) At the highest landing of stairways with stairway access to a roof, and on roofs with a slope of less than 3 in 12 where stairways do not access the roof.

(*See* Ex. D to Status Report, dated September 30, 2022)[35] The roof slope for the building was less than 3 in 12, but the stairways accessed the roof (Bur rebuttal decl. ¶ 9).

Meanwhile, the 2010 version of NFPA 14 is slightly changed, with subparagraph 5 of section 7.3.2 now stating:

> (5) At the highest landing of stairways with stairway access to a roof or on roofs with a slope of less than 4 in 12 where stairways do not access the roof.

(*See* ex. E to Status Report, dated September 30, 2022)

The 2010 NFPA has an annex providing explanations of the intent of the code. The commentary for section 7.3.2 (contained in A.7.3.2) provides in relevant part: "Only one standpipe is necessary to serve the roof; it is not the intent to extend each standpipe to the roof level" (*see* Ex. E to Status Report, dated September 30, 2022).

---

[35] Because the NFPA standards did not appear to exist in the record, but were necessary for our decision, we directed appellant to provide them, which it did as attachments to this status report.

The government's expert, Mr. Fisher, opines that the Navy was correct and consistent with the 2007 NFPA Code to require the additional hose connection at the roof (Fisher Report at 13-14); AGJV's expert, Mr. Bur, disagrees (Bur rebuttal decl. ¶¶ 7-10).

In the same response to the Navy in which it disputed the need for the hose connection on the rooftop, AGJV agreed to perform the additional flow test and stated that the "FPDOR will be available upon request to assist in the set up and to witness the new flow test" (Fisher Report at 13). The requirement for a "recent" flow test prior to design comes from UFC 3-600-01, para 4-2.3.5.1, which states that calculations for design were required to "be based on recent water flow test data" (*id*. at 14). NFPA 14 (which is the standard for the installation of standpipe and hose systems), Section 10.2 also states that "[t]ests for the purpose of system design shall not be conducted more than 1 year prior to system design" (*id*.; *see also* Ex. D[36] to Status Report, dated September 30, 2022).

Fire-Mak performed two water flow tests on February 17, 2012. The water flow was less than the flow test reported in the RFP and less than two of the three tests performed on behalf of AGJV in December 2009, though it showed a higher flow than one of the three December 2009 tests (Fisher Report at 14-15; Bur decl. ¶¶ 22-23). The consequence of these new tests was that Fire-Mak needed to revise portions of the design reflected in the shop drawings it provided (increasing the diameter of some pipes, for the most part) to account for the lower flow rate (Bur decl. ¶ 26; Bur rebuttal decl. ¶ 11).

Regardless of whether Fire-Mak changed its shop drawings after the new flow tests (which he effectively concedes), Mr. Fisher argues that the flow tests did not alter what was required from Fire-Mak since the original design by Alphatec had pipes of a diameter that would have accommodated the lower flow rate (Fisher Report at 16-17). Mr. Bur of Alphatec counters that Alphatec's final corrected drawings are irrelevant since AGJV had delegated the sprinkler design to Fire-Mak, and its original shop drawings (which would have been adequate under the December 2009 flow test results), included the smaller pipes (Bur rebuttal decl. ¶ 13). We will address this issue in more detail in the Decision section, below, but note that the Navy has provided no evidence that AGJV's subcontract with Fire-Mak required it to provide the larger pipes that had been included in Alphatec's final corrected drawings.

---

[36] Exhibit D to the September 30, 2022 status report is the 2007 version of NFPA 14. This is particularly important because AGJV alleges that the one-year requirement was not present in the 2007 NFPA 13, which governs fire sprinklers (app. br. at 152). This is true, but NFPA 14 also applies to the contract, as noted above.

Regardless of matters of responsibility, new drawings needed to be made and approved. Although the date is not clear from the record, Fire-Mak made a new submission to Alphatec for review sometime between the flow tests and March 5, 2012. We know this because on March 5, 2012, Mr. Bur of Alphatec approved the submission "as noted," identifying eight different problems with the submission that needed to be remedied prior to submission to the government (R4, tab 330 at GOV 30104). In a document dated March 13, 2011 (it is obvious to us that it was written in 2012 and that "2011" was a typo), Fire-Mak forwarded a revised submission directly to AGJV, informing it that it had addressed Alphatec's eight concerns (*id.* at GOV 30103). It was received by AGJV the next day, March 13, 2012 (*id.* at GOV 30102). On March 15, 2012, the documents were sent from AGJV to Alphatec and they were received by Alphatec on March 19, 2012 (*id.* at GOV 30101).[37] On March 22, 2012, Mr. Bur approved the submittal "as noted," having identified five different issues requiring Fire-Mak's attention (*id.* at GOV 30100). The drawings and calculations were submitted to the Navy for approval on March 29, 2012 by AGJV (R4, tabs 52, 334).

On April 12, 2012, Ensign Jones asked AGJV for Fire-Mak's response to comments made by the Navy to Fire-Mak's original submittal that it had rejected. AGJV responded on April 13, 2012, including an attachment that had apparently been provided earlier and indicated that the comments had been incorporated into the March 29, 2012 submittal to the Navy. (R4, tab 337) In response, on April 16, 2012, Ensign Jones explained that the document provided by the Navy included questions for some items, rather than a resolution of the issues. AGJV responded on April 17, 2012, that there was no new separate document from Fire-Mak since the response to the government's prior comments was effectively embedded in the new drawings and calculations. (R4, tab 338) Ensign Jones returned to the issue again on April 19, 2012, and asked AGJV for a simple letter from Fire-Mak explaining how the new submission addressed the issues raised with the first one, stating that, without it, the NAVFAC fire protection engineer (Mr. Uribe) would likely reject the submission. On April 25, 2012, AGJV forwarded the requested letter to Ensign Jones. (R4, tab 341) On April 30, 2012, the Navy approved AGJV's revised submittal with some comments that did not prevent Fire-Mak from beginning fabrication of the system (R4, tab 345).

D. The Fire Sprinkler Claim

On May 10, 2012, AGJV submitted a change order request styled as "Proposal No. 88" seeking $20,729 in compensation for additional fire sprinkler work (app. supp.

---

[37] It is not clear to us why the documents were sent to Alphatec by AGJV, but a likely explanation is that Fire-Mak was expected by AGJV to route its submittals through Alphatec before they were sent to AGJV for provision to the government.

R4, tab 122 at APP 2397). It sought compensation for performing the February 2012 flow tests; for redesigning the stand pipe for the roof; and for redesigning the system to account for the lesser water flow (*id*.). In part, it based its entitlement to this compensation on the FAR's Changes Clause, 52.243-4 (JUN 2007) (*see id.* at APP 2356, n.3), which, in fact, is incorporated into the contract (R4, tab 24 at GOV 1189). It alleged that the fire sprinkler problems were responsible for 54 days of delay, but did not seek compensation for that because it was concurrent with other delays (app. supp. R4, tab 122 at APP 2398). The CO formally rejected this change order request by a letter dated October 23, 2012 (R4, tab 81).

On July 29, 2013, AGJV submitted a certified claim to the CO seeking $22,141 in costs associated with the sprinkler flow tests and redesign (R4, tab 85). This claim was only for money damages and provided that damages as a result of delays to the project would be "addressed in separate Requests for Equitable Adjustment" (*id*. at GOV 1571). In part, this claim advanced the theory that the costs had been affected by the differing site condition of the water pressure from the February 2012 flow tests being materially lower than the flow test results included in the RFP (*id*. at GOV 1575-77).

On December 17, 2015, the CO issued a decision denying the claim in whole (R4, tab 87). AGJV filed a timely notice of appeal with the Board on January 27, 2016, which we docketed as ASBCA No. 60428.

On May 19, 2016, the CO issued a one paragraph revision to its December 17, 2015 final decision, noting a different beneficial occupancy date for the project (R4, tab 87 at GOV 1589). AGJV filed with the Board what it characterizes as a protective notice of appeal to this decision on July 15, 2016, which we docketed as ASBCA No. 60691.

VI. The Electronic Security System

At about the same time that the fire sprinkler dispute was heating up, the parties also had a significant dispute about who was responsible for providing the Electronic Security System (ESS) under the contract. This dispute, reflected in Appeal Nos. 60426 and 60689, had consequences for the timing of its installation and thus is related to claims of delay.

A. Contractual Provisions

Section D5030 of the RFP, Communications and Security, is the earliest mention of the ESS in that document. In part, it states, "[t]he infrastructure (conduit and junction boxes) for a complete security and access control system will be provided under this contract." (R4, tab 5 at GOV 442)

It later specified that:

> The General Contractor shall provide/install all conduit
> and junction boxes and the subcontractor shall procure and
> install all electronic equipment (commercial off the shelf)
> including computer, hardware, software, UPS, door strikes,
> etc.  The security subcontractor shall visit the site and
> review security conduit at the rough-in stage.

(*Id*.)

The most detailed provision of the RFP regarding the ESS requirements is Section D503005, Security Systems (R4 tab 5 at GOV 443-44).  In part, it provides that:

> The General Construction Contractor must sub out the
> electronic security system installation to a contractor who
> has direct experience in installing/integrating the new
> system and must have performed Integrated Security
> Management System (ISMS)/Electronic Security System
> (ESS) projects for the Navy for the past 18 months.  The
> subcontractor must have a current certification as a Value
> Added Reseller, as both a supplier of the base approved
> (Security Department) Electronic Security System (ESS)
> equipment, and installer of the base approved ESS.  Any
> licenses for system software upgrades must be included in
> this installation.  A complete design indicating all major
> equipment in the security system shall be provided to the
> Government for review.  This drawing package shall be a
> controlled document and shall be updated as needed.

(R4, tab 5, at GOV 443)  Later paragraphs in the same section set forth requirements for the ESS and require that the contractor "provide" numerous features in the ESS (*id*. at GOV 443-44).  This later text also imposes requirements about how the ESS subcontractor and the general contractor should work together for installation:

> The General Contractor must coordinate the construction
> of the facility with the ESS subcontractor to allow him
> enough time to inspect the conduit and junction boxes
> before he starts closing walls to make certain that all
> necessary conduit and junction boxes are in the proper
> locations.

(R4, tab 5 at GOV 443)

31

The RFP also states that "[t]he contractor shall submit the ESS design, as well as the testing and commissioning plan to the Government for review and approval" (*id*. at GOV 444).

Section G403007 of the RFP provides that the ESS discussed in Section D503005 (discussed immediately above) was for the interior of the project and then sets forth requirements for the provision of the exterior ESS. This included magnetic switches, card readers, and exit buttons, and required conduit and junction boxes be provided to all exterior doors. It also required, with Section G409001, "rough-ins" for exterior closed circuit television cameras.[38] (*See* R4, tab 5 at GOV 469)

Without getting ahead of the legal discussion to follow in the Decision section below, one basis for the dispute over whether the RFP requires installation of the ESS lies in its discussion of funding in Section D503005. In relevant part, the section provides:

> Since the funding (OPN funds) for design, procurement, and installation of the ESS will be provided separately, the base contracting officer must contact Mr. Mike Viggiano, at NFESC Port Hueneme, CA at [phone number redacted][39] to coordinate the transfer of funds. MCON Construction Project funds can not be used for the Electronic Security System.

(R4, tab 5 at GOV 443) The parties have not directed us to any part of the record indicating how the ESS costs were to be bid, and our review of AGJV's Phase II Proposal documents (*see* R4, tabs 18, 22) has not found anything immediately apparent as being material to the issue.

### B. How The Parties Initially Treated the ESS Requirement

The initial design analysis prepared for the project by AGJV[40], dated November 25, 2009, which was quite skeletal, included a section on the Security System which, *in toto*, provided: "An empty conduit system shall be provided for the security, access and CCTV [closed circuit television] systems per the RFP" (R4,

---

[38] We take this to mean that exterior closed circuit television cameras were not required to be installed by the contract, but that the contractor was expected to create an infrastructure for them if they were later desired.

[39] We have deleted Mr. Viggiano's phone number in this published decision.

[40] It was labeled as being done by Grimberg, rather than AGJV (*see* R4, tab 126 at GOV 28580), though, of course, it was submitted on behalf of the joint venture.

tab 103 at GOV 28360).  Identical language may be found in the February 19, 2010 Design Development Design Analysis (*see* R4, tab 126 at GOV 28610).

In a series of discussions about subsequent design submissions, Mr. Angelo Tjournas from the Navy initiated an inquiry on July 27, 2010 regarding the exterior CCTV system in which he stated that he did "not have a copy of the RFP but the security system is to be bid as a bid item."  On August 4, 2010, Mr. Caudle replied on behalf of AGJV stating that "the security system components" would be provided "under a separate contract" and that AGJV would provide the "infrastructure" for the exterior cameras.  On August 19, Mr. Tjournas responded that, "[a]ll we need is infrastructure for the ESS contractor to add devices."  Mr. Caudle replied on August 30 that the conduit necessary for the cameras was shown in the drawings and the installation would be completed by the ESS contractor.  On October 6, 2010, Mr. Tjournas closed the issue without further comment.  (R4, tab 150 at GOV 1342)

In page E001 of the design drawings issued for construction on October 15, 2010, under "SECURITY," Alphatec[41] wrote:  "THE SECURITY SYSTEM FINAL DESIGN AND COORDINATION AND CONSTRUCTION WILL BE PROVIDED UNDER A SEPARATE CONTRACT.  THIS CONTRACT INCLUDES THE INFRASTRUCTURE ONLY.  REFER TO THESE DRAWINGS AND DETAILS FOR MORE INFORMATION" (app. supp. R4, tab 132).  The record does not indicate the government's making any objection to this characterization.

C.  The Parties Recognize a Disconnect

On January 4, 2012, AGJV asked the Navy to set up a meeting with the security subcontractor for the project (app. supp. R4, tab 87 at APP 1796).  The parties had a meeting on February 13, 2012 to discuss the matter and Mr. Duda of AGJV stated that the Navy was responsible for getting the security contractor.  Ms. Julie Jacko from Naval Facilities Command sent Mr. Duda an email valentine of sorts the next day, informing him that, no, under the RFP, AGJV was responsible for obtaining a subcontractor to design and install the security system.  (*Id.* at APP 1797)  Mr. Duda responded the same day, advancing the argument that the RFP made the subcontractor the responsibility of the Navy and arguing that the contract documents made the security system a separate contract and that Mr. Tjournas, who had been coordinating design with Alphatec on behalf of the Navy, held the same view (*id.* at APP 1796-97).  More email was exchanged the same day, with Mr. Amanze from the Navy reiterating the position that the RFP required AGJV to obtain a subcontractor, while Mr. Duda reiterated the position that he had articulated to Ms. Jacko (app. supp. R4, tab 175 at APP 2672).

---

[41] Alphatec performed these design services on behalf of AGJV as previously discussed.

33

D. The Parties Attempt to Negotiate a Change Order to pay for the ESS

The parties have pointed to no further correspondence in the record regarding responsibility for the ESS. At some point, however, we can infer that the Navy decided to bite the bullet and pay AGJV an additional sum to have it designed, built, and installed. To that end, on March 6, 2012, the Navy issued an "RFP Modification" pursuant to the contract's Changes Clause, directing AGJV to submit a proposal to design and build a security system for the project that would meet the requirements of the original RFP; provide acceptance tests and inspections of the security system as required by the original RFP; and to update all project drawings to incorporate the approved security system design (R4, tab 46 at GOV 1321-22). The RFP Modification made AGJV's cost proposal due on March 20, 2012 and allowed for the possibility that AGJV might request more time to complete the contract, although it required AGJV to justify any such time extension (*id*. at GOV 1321).

On March 9, 2012, the Navy sent another letter to AGJV, authorizing it to incur $20,000 in costs on the ESS, but no more prior to acceptance of its proposal (R4, tab 47 at GOV 1324).

On March 20, 2012, AGJV submitted its proposal (R4, tab 49 at GOV 1329). It sought $176,382 in direct costs for the ESS subcontractor, Executive Technologies Corporation (ETC); $19,288 in its own direct costs ($17,638 of which was for Alphatec to incorporate an ESS into its pre-existing design (*see id.* at GOV 1331)), plus a markup; a 13-week time extension; extended overhead for that time extension, summing to $203,996; markups and a 6 % profit. The grand total was $445,679. (*Id*. at GOV 1330)

The government found the proposal excessive. The CO sent a letter to AGJV on March 22, 2012, detailing the Navy's objections, including the Navy's view that AGJV's proposal was charging it for work that it had already acknowledged it was required to do (the conduit); design work that should have been unnecessary; and (what the government believed to be) an unsupported 13-week time extension. The letter directed AGJV to submit a new proposal. (R4, tab 50) A subsequent email to AGJV from Ms. Jacko on April 4, 2012, gave a condensed version of issues that needed to be addressed in a resubmittal (R4, tab 53). That was rejected by AGJV in an undated letter sent shortly thereafter (R4, tab 54).

The parties apparently had a meeting on April 16, 2012, that didn't resolve matters, and on April 25,[42] 2012, AGJV sent a letter to the Navy "stand[ing] behind" its earlier proposal and asking the Navy to simply issue a unilateral change order so

_____

[42] The letter is dated March 25, rather than April 25, but, as it references events in April (*see* R4, tab 51), we are persuaded that this is just another typo.

34

that construction would be delayed no further. The letter promised that the design would be completed within three weeks of the receipt of the unilateral change order. (R4, tab 51)

The Navy refused to issue the requested unilateral change order. Instead, on April 30, 2012, the CO wrote to AGJV that it could not issue a change order until it considered AGJV's final design of the ESS so that it would know what equipment it would be purchasing in the change order. It further directed that AGJV provide the final design by May 14, 2012. (R4, tab 61)

On May 14, 2012, AGJV submitted a new ESS proposal to the Navy. The bottom line was slightly higher than its earlier offer (now, $452,304 versus the $445,679 mentioned above) and it included a detailed estimate from its proposed subcontractor, ETC. (R4, tab 63) The Navy asked for revisions shortly after receiving the proposal and, on May 23, 2012, AGJV forwarded a revised version of its proposal, including an updated breakdown of costs from its subcontractor (R4, tab 65 at GOV 1414). There was more back and forth, with a slightly revised proposal being submitted the next day, May 24 (R4, tab 66); government comments being provided on June 5 (*see* R4, tab 67 at GOV 1436 (referencing comments)); and a final revised version being submitted by AGJV on June 6 (R4, tab 67), which was approved by the government on or about June 9, 2012 (Duda decl. ¶ 26; Greenwell decl. ¶ 23).

The government did not agree to the 13-week time extension sought by AGJV. Instead, the CO sent a letter to AGJV stating that installation of the ESS was a requirement of the contract and that AGJV should have planned on it. (R4, tab 68 at GOV 1447-48) On the other hand, "[i]n the interest of partnering," the Navy decided to allow ESS work to be considered independent of substantial completion, meaning that the beneficial occupancy date (BOD) could be determined to have been met even if there were items remaining to be completed for the ESS. Put another way, there would be no liquidated damages assessed "solely for non-completion of the ESS." (*Id.* at GOV 1448)

It is important to recognize that, though the parties had agreed to the scope of work and the government had apparently approved AGJV's and ETC's plans by June 9, 2012, no change order had issued. As will be seen below, that did not occur until November 2012.

E. The Work on Installing the ESS

Even before the Navy approved the ESS plans, AGJV and ETC performed some work related to the ESS. On March 14, 2012, AGJV sent a letter to the Navy inquiring whether it should delay closing the drywall at the building site because of the RFP's requirement for the drywall to remain open until the ESS conduits and boxes

35

could be inspected (R4, tab 48). We did not see a response to this request in the record, but presumably the Navy communicated that, consistent with the RFP, the drywall was to remain open until investigation. We can surmise as much because on April 26, 2012, AGJV sent a letter to Ms. Jacko informing her that ETC had inspected the conduit rough-ins and was satisfied with them and that AGJV would proceed to close the drywall (R4, tab 57).

More significant work installing the ESS began quickly after the Navy approved ETC's design in early June. On June 18, 2012, AGJV reported to the Navy that ETC had begun work at the site on June 11, 2012 and expected to be finished by July 23, 2012 (R4, tab 69 at GOV 1451). By June 13 (just two days later), AGJV was reporting that the work was 65% complete in the field (app. supp. R4, tab 67 at APP 410).

On about June 24, 2012, AGJV requested that the Navy provide it 10 IP addresses for use by the security equipment (Greenwell decl. ¶ 25; Duda decl. ¶ 28; app. supp. R4, tab 262 at APP 3237). There were delays in getting this information to AGJV (in part, because the particular IP addresses to be provided depended upon the equipment they were to be used for; in part because some of the responsible Navy individuals were on leave at the time the request was being processed) (*see* app. supp. R4, tab 262). Ultimately, the IP addresses were provided at the end of July 2012 and then revised on or about August 1, 2012 (Greenwell decl. ¶ 25; Duda decl. ¶ 28). On July 18, 2012, while awaiting the IP addresses, AGJV reported that ETC had "done all that they can do" until it received the IP addresses and that, after their receipt, it would take approximately two weeks to conclude the work, which appears to have mostly involved setting up for testing (*see* app. supp. R4, tab 70 at APP 437). Though the lack of IP addresses plainly prevented testing of the system, there is no evidence before us that it delayed the hardware installation.

After receipt of the IP addresses, the parties originally scheduled the ESS testing for August 9, 2012, but re-scheduled it for August 17, 2012. On August 22, 2012, the ESS system testing was considered complete, and the system was accepted. (App. supp. R4, tab 294 at APP 5781)

F. The Change Order for the ESS is Issued

On November 21, 2012, the CO executed Modification No. P00002 (Mod P2), which purported to be effective on November 19 (R4, tab 82 at GOV 1551). Mod P2 was a unilateral modification that provided authorization and funding for AGJV to design, install, and test the ESS. In particular, it stated that it was being issued "to allocate payment for the security system through Anti-Terrorism Force Protection AT/FP funding." It provided $151,019 in additional funding to the contract to pay for it and added 91 days (13 weeks, it turns out) to the contract completion date, making it

June 28, 2012. It did not, however, purport to pay AGJV overhead on those 91 days. The extra 91 days, nevertheless, affected the Navy's calculation of liquidated damages for late contract completion (much more on that subject below), and caused the Navy to release $477,750 to AGJV. (*Id*. at GOV 1552-53)

Important to the arguments that AGJV would later make, Mod P2 refers to "new work." The work detailed in that section was to:

> (1) Design and build a security system for MILCON P-166 IAW the requirements of the P-166 RFP Part 3 Section D503005 and G403007.
>
> (2) Provide all acceptance tests and inspections of the security system as required by P-166 RFP Part 3 Section D503006.
>
> (3) Update all applicable project drawings for MILCON P-166 to incorporate the approved security system design.

(*Id*. at 1552)

Mod P2 rejected $7,724.72 in costs associated with labor on the exterior systems and $1,668.52 in costs associated with exterior materials (*id*.). Markups acknowledged in Mod P2 included 5% prime contractor overhead on subcontractors; 6% prime contractor profit; and 1% bonding (*id*.), thus, Mod P2's disallowance of those costs would sum to $10,520.34 ($7,724 + $1,668 = $9,393.24, which is then multiplied by 112% to account for the markups).

G. AGJV's ESS Claim

Needless to say, Mod P2 did not satisfy AGJV. On July 2, 2013, AGJV submitted a certified claim to the CO. This ESS claim sought an additional $30,513 in direct costs for the work associated with Mod P2. These were comprised of $16,513 for the exterior ESS components; $11,999 for Alphatec's additional design work; and $2,001 for the additional work required by AGJV's scheduler. (R4, tab 84 at GOV 1559-62, GOV 1569) It also sought an additional 55-day contract extension and a release of all liquidated damages on the contract (*id*. at GOV 1562). The theory for the extra 55-day extension was that the ESS was not accepted until August 22, 2012, which was 55 days after June 28, 2012— the contract extension contained in Mod P2 (*id*.). The release of *all* liquidated damages (an amount greater than the

55-day calendar day extension)[43] was premised upon notions that liquidated damages were inappropriate when the government extended the period of contract performance (*id*. at GOV 1566-68).  AGJV recognized that this may be an unpersuasive argument (and, as discussed below, it is, indeed, unpersuasive) and made the fallback argument that the government should at least release the $288,750 in liquidated damages that were associated with the 55-day extension (*id*. at GOV 1568).

The CO's decision on the claim, issued on December 18, 2015, was largely a victory for AGJV.  The CO denied the extra costs and the request to set aside all liquidated damages but granted the 55-day contract extension (until August 22, 2012), thereby releasing the corresponding $288,750 in liquidated damages, along with $12,698.62 in interest.  (R4, tab 86 at GOV 1584-85).

AGJV filed a notice of appeal of this decision on January 27, 2016, and the Board docketed it as Appeal No.  60426.

On May 19, 2016, the CO issued a revised final decision, leaving its previous decision intact, but also affirmatively seeking the remaining $199,500 in liquidated damages (R4, tab 86 at GOV 1582-83).

AGJV filed a protective notice of appeal of this final decision on July 15, 2016, and the Board docketed it as Appeal No.  60689.

VII.  The Government's Imposition of Liquidated Damages

Inasmuch as liquidated damages have come into play with the ESS issues, we now turn to issues of the contract completion date and the beneficial occupancy date, which are relevant to Appeal Nos. 60427 and 60690.

A.  Contract Extensions Prior to Mod P2

In a contract modification effective July 7, 2011, but executed by the CO on August 19, 2011, the Navy extended the contract completion date (CCD) by eight calendar days:  from February 8, 2012 to February 16, 2012 (*see* R4, tab 29 at GOV 1232-33).  This was a bilateral modification, as it was also signed by AGJV on August 12, 2011 (*see id*. at GOV 1234).  The modification included the words:

---

[43] The Navy held $488,250 in liquidated damages at the time of this claim, which is more than the 55 days multiplied by the $5,250 per day liquidated damages rate of the contract (R4, tab 84 at GOV 1568).

CONTRACTOR'S RELEASE. Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full for both time and money and for any and all costs, impact effect, and for delays and disruptions arising out of, or incidental to, the work as herein revised.

(*Id*. at GOV 1232; GOV 1234)

The next change to the CCD came through another contract modification, Modification No. A00006 (Mod 6), dated October 13, 2011 (*see* R4, tab 31). Mod 6 purports to be a bilateral modification, and its text states that it was the result of negotiations held on October 11, 2011 (*see id.* at GOV 1246), but the record does not include the signature of an AGJV representative on it (*see* R4, tab 31 at GOV 1245). In any event, Mod 6 was a no-cost modification that extended the CCD by 42 days, to March 29, 2012, as a result of the "unusual weather experienced during Hurricane Irene and Tropical Storm Lee as well as due to an excess number of rain fall days experienced during Spring 2011" (*id*. at GOV 1246).

B. The Government Expresses Schedule Concerns and Imposes Liquidated Damages

When the March 29, 2012 CCD date came and went without completion of the project, the Navy CO began imposing liquidated damages at the $5,250 daily rate provided by the contract by withholding funds from AGJV's monthly invoices (*see* R4, tab 59 at GOV 1368). The parties had seen the delayed completion of the project coming for a long time. The Navy sent its first letter of concern about completion delays on July 7, 2011 (R4, tab 37), with a second one being issued on January 11, 2012 after AGJV's construction schedule submitted by AGJV on January 9, 2012 indicated a CCD of June 13, 2012 (R4, tab 38). The January 11, 2012 letter warned of liquidated damages (*id*.). Another letter of concern was sent on April 27, 2012 after liquidated damages had begun to be assessed, though the parties already had several in-person meetings in which scheduling concerns had been front and center by this time (R4, tab 59 at GOV 1368-69; Gannon decl. ¶ 6).

C. Completion of the Project

1. Problems That Affected the Completion

There were a lot of things going on that hindered the completion of the project that had nothing to do with the Navy, the ESS, or the sprinkler system. The installation of the roof and the windows were critical, not just for their own sake but also for permitting work to begin on the interior of the building once it could dry out

39

from the elements (Reichard Report at 15-16).[44]  A table in Mr. Reichard's report comparing AGJV's plans as of November 30, 2011 with the same plans three months later, on February 29, 2012, demonstrates how this work was delayed:  the roof membrane was delayed from being completed on January 3, 2012 to March 7, 2012; and the windows, which were to be delivered on January 6, 2012, were not, in fact, delivered until March 5, 2012 (Reichard Report at 16).  Structural metal spandrels, necessary for the sunshades (related to the windows) were also seriously delayed in their delivery (*id.* at 14; Wustner decl. ¶ 13).  Though AGJV attempted to mitigate the problem of roofing delay by taking "temporary protective measures," these measures were suboptimal and allowed water entry into the building (Reichard Report at 15).  Indeed, these problems led to a requirement to remove and replace wet drywall (Wustner decl. ¶ 21; R4, tab 55 (April 23, 2012 email noting water infiltration in multiple areas requiring replacement of drywall)).  The roof, apparently, was never quite right and ultimately needed replacing after the contract was completed (Wustner decl. ¶ 14; Gannon rebuttal decl. ¶ 7).

And it took substantial time for AGJV to get the installation of the windows and the window curtain wall[45] right.  The windows were required to be tested before being installed (in the late spring / early summer of 2012), but AGJV's installer failed to conduct the tests.  The tests were then conducted, the windows failed, and then needed to be removed and reinstalled.  (Wustner decl. ¶¶ 21-22).  The problems with the windows led to further water infiltration, requiring the replacement of damaged carpet and yet more drywall (*id.* ¶ 23).

Additional problems abounded in the installation of the HVAC system and other mechanical aspects of the building.  Mr. Barry Amrich, P.E., is a mechanical engineering subject matter expert who was brought in by NAVFAC in April/May 2012 to inspect the mechanical equipment and system installation of the project (Amrich decl. ¶¶ 2, 5).  Mr. Amrich's first inspection, on April 27, 2012, turned up a host of problems with the HVAC and plumbing systems including:  duct and piping insulation was often torn or compressed; pipes and ducts penetrated fire partitions without wall sleeves or other fire protection; poorly installed ducts; a water heater that was "'pinned' in" by pipes so that it could not be easily removed if necessary for replacement; space deficiencies where, essentially, too much equipment was crowded

---

[44] We cite here the report of David Reichard, P.E., dated July 20, 2020.  Mr. Reichard, whose *curriculum vitae* indicates 25 years of experience in the construction industry and multiple instances of being recognized as a scheduling expert by the Board, state courts, and United States District Courts (*see* Reichard Report, attach. 1), is the government's scheduling expert, and AGJV has made no objection to our consideration of his testimony as an expert, which we do.

[45] The "window curtain wall" was essentially a wall that was a window from the slab to the ceiling (*see* R4, tab 5 at GOV 415).

into too small a space; and many other defects in workmanship including such things as problems with ductwork and a joint of two exterior walls that was so poor that he could see through it from the inside to the outside even as drywall and insulation were being installed which would be open to the elements (*id*. ¶ 6).

Mr. Amrich continued to see significant and extensive problems as he visited the building in May through July 2012 that we will summarize as shoddy workmanship throughout the HVAC space that was often below the industry and RFP standards (*see* Amrich decl. ¶¶ 7-28). Nevertheless, by late July, Mr. Amrich was writing his colleagues about the beneficial occupancy date (BOD) and what needed to be done to meet it (*id*. ¶ 29).

### 2. The Beneficial Occupancy Date

For all its problems, however, work on the project slowly advanced.

The BOD is, for lack of a more precise term, "squishy." In the end, most of the issues that the Navy identified as affecting the BOD were complete by September 18, 2012, although some were not and would remain problematic for some time. The Navy did not move into the building at that time, but (as will be seen) retroactively set the BOD for September 30, 2012, which appears to have been somewhat arbitrary. We discuss all this in more detail below.

First, we include the list of primary issues the Navy identified in the Summer of 2012 as affecting the BOD. On July 2, 2012, AGJV sent the Navy a rather ambitious letter, seeking to have the building declared ready for beneficial occupancy, notwithstanding the significant punch list with un-resolved items that it attached to the letter (*see* app. supp. R4, tab 107). The Navy was unpersuaded, and in a letter dated July 7, 2012, rejected AGJV's request, reminding AGJV that it had provided it a "Red Zone" checklist at a meeting on June 18, 2012 and that there were five large items that stood in the way of accepting the building: 1) certification of the roof; 2) acceptance of the furniture, fixtures and equipment (FF & E); 3) acceptance of the fire protection system; 4) completion of the testing and balancing of the HVAC system; and 5) correction of operations and maintenance support information (OMSI) deficiencies. The letter also noted that the list of five items was "not a complete list" and referred AGJV to the Red Zone checklist. (R4, tab 75 at GOV 1506)

About a month later, on August 6, 2012, the Navy sent another letter to AGJV about beneficial occupancy. In this letter, the Navy stated that it wanted to "bring to your attention some additional concerns we feel may impact your progress." It listed the five items called out in the July 9 letter and added a sixth: "Windows need to pass all required acceptance tests." Like the July 9 letter, this one explained that these were

the major points, but that there were others preventing acceptance of the building as well. (R4, tab 456 at GOV 30792)

In a five-page letter dated August 7, 2012, complaining about the assessment of liquidated damages, notwithstanding the Navy's refusal to allow weekend work, AGJV inserted a line stating that it "believes it is now substantially complete with the project" (app. supp. R4, tab 109 at APP 1935). This letter did not address the concerns set forth in the Navy's correspondence *(id.* at APP 1931-35). On August 10, 2012, AGJV sent another letter to the Navy purely on the subject of beneficial occupancy. This letter went into great detail about the six primary issues raised by the Navy's August 6 letter, largely arguing that they were already completed, on the way to being completed, or not necessary for beneficial occupancy. (App. supp. R4, tab 110) A subsequent letter from AGJV to the CO, dated August 29, 2012, laid out AGJV's plans for completing the final work necessary for occupancy *(see* app. supp. R4, tab 112).

In its brief, AGJV goes into detail about the six issues that the Navy had asserted were its primary concerns regarding beneficial occupancy *(see* app. br. at 51-55), but the Navy, for its own reasons, chose not to address these issues in any detail in its response. We have reviewed the evidence and conclude that:

First, the roof system was completely installed, inspected, and approved by the subcontractor and manufacturer by August 22, 2012. We base this finding on the unrefuted declaration of John Greenwell, who says so directly *(see* Greenwell decl. ¶ 59), though we make this finding with some trepidation because the documentary evidence referenced in AGJV's brief for this proposition *(see* app. br. at 51-52 (citing R4, tab 481 at GOV 31304, 31306; 492 at GOV 31371)) does not actually support this finding, and, instead, demonstrates a failure of the roof inspection on August 6, 2012 (R4, tab 481 at GOV 31306). Nevertheless, Mr. Greenwell's testimony is unrefuted and, based upon the evidence before us, we find it, more probably than not, true.

Second, as AGJV asserted in its August 10, 2012, letter *(see* app. supp. R4, tab 110 at APP 1936), the FF&E was apparently delivered and installed in the first two weeks of June 2012. We see evidence of this in the daily reports for this time period *(see* app. supp. R4, tab 78 at APP 1195-APP 1224). We see no rebuttal of this allegation from the government except its brief's reference to the need to move some furniture in late September/early October 2012 to allow for carpet remediation caused by flooding from leaky windows *(see* gov't br. at 134-35 (citing[46] app. supp. R4,

---

[46] Navy counsel cited to the entire 887-page tab containing all the contractor's reports, rather than including the pin cites that we have provided above. Needless to say, that was inadequate.

tab 78 at APP 1380-87)), but this does not prove that the FF&E had not been properly installed earlier.

Third, acceptance of the fire alarm and fire protection system was apparently completed by the end of August, 2012. First, the sprinkler system was actually completed prior to July 30, 2012 (*see* app. supp. R4, tab 112 at APP 1955). Despite the Navy's identification of numerous defects in the fire alarm and fire protection systems in a July 30, 2012 report (*see id.* at APP 1955-56), Mr. Greenwell and Mr. Duda testified that all the issues that would affect beneficial occupancy were completed by August 29, 2012 (*see* Greenwell decl. ¶¶ 68-72; Duda decl. ¶¶ 71-75). The Navy has identified no contrary evidence except for a portion of Mr. Fisher's expert report (about fire sprinklers) which concedes that the sprinklers were approved earlier, but that the fire alarm system was not approved until September 19, 2012 (*see* gov't br. at 104 (citing Fisher Report at 19-20)). Since the Fisher Report is not focused on the fire alarm system and cites no basis for its September 19 date that we may independently verify,[47] we will give greater weight to the testimony of AGJV's two project managers.

Fourth, the HVAC system appears to have been ready for use by September 18, 2012. Messrs. Greenwell and Duda testified on behalf of AGJV that the HVAC system was ready for use on August 10, 2012 (Greenwell decl. ¶ 61; Duda decl. ¶ 64), but the daily reports indicate otherwise. Namely, the September 18, 2012 daily report shows multiple workers onsite, including four specifically to handle HVAC issues, with the word, "commissioning," contained in their work description (app. supp. R4, tab 78 at APP 1364). The next page of the daily report contains this paragraph:

> Punch list. Cutting pavers for placement on green roof. HVAC punch list/commissioning. Demonstrate smoke detector works in elevator shaft. Performed Dynamic testing of West elevation current wall. HVAC technician for troubleshooting AHU-2 and final commissioning. Function testing and verification of HVAC equipment with NAVFAC. Install grommets in counter tops at reception desk. Curtain wall installer onsite for testing. Verify FA alarm is operating as designed with AHJ. Onsite for final commissioning and verification of HVAC equipment operation with NAVFAC.

(*Id*. at APP 1365)

---

[47] While it is *possible* that there is additional support for this date somewhere in the vast record of this case, it is not readily apparent to us where it might be, and we have already done more than enough of the Navy's work for it.

AGJV characterized all the work being done on September 18, 2012 as mere "punch list" work (*see* app. br. at 52 n.3) and, indeed, its daily report uses that moniker, but at the end of the day, the HVAC system, by AGJV's own characterization, was neither verified with NAVFAC, nor considered commissioned until this day. And AGJV has provided no basis for us to question the withholding of commissioning until this date as unreasonable. To us, that means that, despite having finished a large number of items on the road to completion, the HVAC system, a prerequisite for building occupancy, was not considered complete until this date. Indeed, Mr. Duda states that September 18, 2012 was the date at which the Navy "signed off" on completion of the HVAC system (Duda decl. ¶ 65).[48]

The government argues that, even by the September 29, 2012 BOD that it (in its view) generously selected, the HVAC system was not complete. In support of this assertion, it cites Mr. Amrich's declaration and the declaration of Mr. Matthew Konschak, who, among other things, notes that the building was extremely cold in October when he visited it before personnel moved in. (*See* gov't br. at 135 (citing Amrich decl. ¶¶ 41-42); gov't br. at 81, 136 (citing Konschak decl. ¶ 7)) But, as cited by the government, Mr. Amrich's concerns regarding the BOD are too general in nature to override the apparent agreement of the Navy to commission the HVAC system on September 18, 2012; and Mr. Konschak's evidence that the building was cold one day in October 2012 could be explained by a host of factors that are not deficiencies that would preclude beneficial occupancy. To be sure, there is evidence that the HVAC system had significant problems after the BOD, as Mr. Amrich discussed at length in his declaration, but the Navy accepted it on September 18, 2012, and many of those problems did not manifest themselves until after substantial completion and the move-in.

Fifth, there is no evidence that the OMSI deficiencies were a significant issue into August 2012: as AGJV has argued (*see* app. br. at 55), the Navy considered OMSI information to be necessary for final completion, but not to preclude a finding of substantial completion in this particular case (*see* Greenwell decl. ¶ 73; Duda decl. ¶ 76). The Navy has produced no evidence to contradict these declarations.

Finally, there is the issue of the windows, which were a continuing headache for all involved. As discussed above, they were initially installed improperly and required a remediation plan. In fact, as AGJV admitted in its August 29, 2012 letter to the CO, proposing its way forward to conclude the project, although the curtain wall

---

[48] We note that there were still technicians working on the HVAC system the next two days, according to the daily reports, but they seem to be much more limited in scope (*see* app. supp. R4, tab 78 at APP 1366-69) and we conclude that September 18, 2012 was, in fact, the day, that the Navy conceded the HVAC system was substantially complete.

44

appeared to have finally been fixed, after having failed a third party test (apparently sometime in August) (*see* app. supp. R4, tab 112 at APP 1949), AGJV still needed to repair the other windows, though it had a repair plan that was to be concluded by September 7, 2012 (*see id*. at APP 1950). As AGJV notes in its brief, the last of the remediation work reflected in its daily production reports occurred on September 4, 2012 (*see* app. br. at 53 (citing app. supp. R4, tab 78 at APP 1334-45)). What AGJV does not note in its brief is that there was a requirement for third party testing of the window curtain (acknowledged in its August 29, 2012 letter to the CO (*see* app. supp. R4, tab 112 at APP 1949)), which was not fulfilled until September 18, 2012 (*see* app. supp. R4, tab 78 at APP 1364-65 (reflecting the testing by the curtain wall installer)). We also note that, according to AGJV, the reason the testing for the curtain wall was conducted on September 18, 2012 and not earlier was because of the availability of AGJV's subcontractor, which AGJV had attempted to have come earlier (*see* app. supp. R4, tab 112 at APP 1949).

Considering the multiple and ongoing failures of the windows, we do not consider this testing to have been a mere formality, but a necessity before the Navy could consider the building ready for occupancy.[49]

Because the Navy has not given us any other bases for challenging a BOD after the curtain wall and HVAC were accepted, we find the building was apparently ready for its intended use as of September 18, 2012.

D. The Navy's Adjustment of Liquidated Damages and AGJV's Claims on the Same

On October 19, 2012, the Navy sent a letter to AGJV remarking upon an inspection of the building conducted on October 10, 2012 and listing the many things that needed to be completed on the building under the contract (*see* R4, tab 80). The letter also set the BOD at September 29,[50] 2012, though it did not provide much of a rationale for that date (*see id.* at GOV 1522). The Navy now suggests that the September 29, 2012 date was more of an act of grace towards the contractor than a belief that the building was truly ready to use by that date since it was not really ready to use until sometime after that date, notwithstanding a November 1, 2012 ribbon-cutting ceremony (*see* Konschak decl. ¶ 7).

---

[49] The windows (and roof) apparently leaked again in October 2012 (*see* Konschak decl. ¶ 7), but this occurred after the windows passed inspection and after the date that the government set as the BOD.

[50] At one point, the Navy's brief says the 28th of September (gov't br. at 133). This was apparently a typo.

In any event, as discussed in the section on the ESS above, the CO ultimately adjusted the liquidated damages to match the (unilaterally decided) contract completion date of August 22, 2012. Thus, the liquidated damages currently held by the Navy are for the 38-day period of August 23, 2012 until September 29, 2012 at $5,250 per day, which sums to $199,500. (R4, tab 86 at GOV 1582-83)

AGJV appealed the Navy's initial imposition of liquidated damages in Appeal No. 60427 and then revisited the matter when it submitted Appeal No. 60690 after the Navy reduced its liquidated damages.

## VIII. <u>Acceleration</u>

As the reader may recall from the discussion above, from October 13, 2011 until the issuance of Mod P2 on November 21, 2012, the CCD was contractually set at March 29, 2012 and the Navy, beginning in April 2012, was withholding liquidated damages from AGJV. According to AGJV, though it took the position that it was not at fault, the Navy's inflexibility on the CCD; its imposition of liquidated damages; and its refusal to allow weekend work caused AGJV to order accelerated and overtime work from its subcontractors at substantial additional cost (*see* Greenwell decl. ¶ 46; Duda decl. ¶ 49). This acceleration, according to AGJV, began in the week ending May 1, 2012, and concluded the week ending August 30, 2012 (*see* Greenwell decl. ¶ 47 (acceleration ended on August 28, 2012)); Duda decl. ¶ 50 (same); *see also* app. br. at 45-46 (citing app. supp. R4, tab 210 at APP 2842; 215 at APP 2946; 221 at APP 3000; 224 at APP 3024; 230 at APP 3080; 238 at APP 3126; 243 at APP 3170-72; 286 at APP 3827-36)).

According to AGJV, it assigned additional supervisors during the alleged acceleration period, increased the supervisory roles of others, and brought in additional equipment (Greenwell decl. ¶¶ 48-49; Duda decl. ¶¶ 51-52). For these particular allegedly added expenses, AGJV has not, in its statement of facts or declarations, explained how acceleration increased their costs. That is, there is no evidence that the costs of more supervisors for a shorter period of time (via acceleration) was greater than a smaller number of supervisors over a longer period of time would have been. The same goes for the extra equipment.

AGJV's two relevant declarations (by Messrs. Duda and Greenwell), without documentary support and in word-for-word identical language, also assert that there were acceleration costs from its subcontractors, including a labor claim from its electrical subcontractor, LACO; an acceleration claim from its FF & E subcontractor; the cost of its flooring contractor providing a moisture barrier for a concrete pour performed before windows were installed; and the expediting of HVAC balance testing which required more work from the original contractor and the hiring of an additional subcontractor (Duda decl. ¶ 53; Greenwell decl. ¶ 50).

AGJV does provide some separate documentary evidence through some email correspondence that its subcontractors charged it more due to overtime allegedly incurred due to acceleration: on April 27, 2012, AGJV directed its electrical subcontractor, LACO Electric, to increase manpower to complete the job in "4-6 weeks" (app. supp. R4, tab 210 at APP 2842), and two weeks later LACO noted that it began working 10-hour days in response (but it had not availed itself of the 10-hour days beforehand) (app. supp. R4, tab 221 at APP 3000); on May 25, 2012, AGJV met with its furniture installation subcontractor, Price Modern, and requested delivery and installation be completed by June 15, 2012, which led to a commitment to work 12-hour days, but also a demand for an $84,450 change order by Price Modern for "the accelerated schedule and storage fees incurred by Price Modern to date"[51] (app. supp. R4, tab 230 at APP 3080); and on June 7, 2012, AGJV told an HVAC contractor, Baltimore Air Balance, that it would need to work whatever hours were necessary to complete its work and that it would then need to submit a request for extra compensation if that was work outside the contract (app. supp. R4, tab 238 at APP 3127).

We do not find the evidence before us that there were acceleration costs to be overwhelming and, in many instances, the documentary evidence raises as many questions as it answers, but the *unrefuted* declarations of Messrs. Duda and Greenwell have enough evidentiary weight to persuade us that, after the end of April 2012, AGJV did direct at least some of its subcontractors to act with greater speed and this direction did increase the costs charged to AGJV.

On April 26, 2018, AGJV submitted a certified claim to the CO seeking $524,783 that it asserted was due as a result of acceleration (*see* app. supp. R4, tab 286). The CO has not decided this claim and, on July 23, 2018, AGJV appealed this deemed denial to the Board. We docketed it as Appeal Number 61715.

IX. A Final, but Significant, Evidentiary Note

AGJV has not cited a scheduling expert of its own anywhere in its opening or reply briefs and we have not found one within the Rule 4 File or AGJV's supplement thereto. Thus, we have before us no assertion from AGJV of the number of days particular government actions may have delayed completion of the project along its critical path except, perhaps, in the requests for additional time that AGJV made to the government during contract performance. The government, on the other hand, has provided a report from its scheduling expert, Mr. Reichard, which we have discussed

---

[51] We are not certain how storage fees are related to the acceleration claim as they appear to be more a reflection that, because the building was behind schedule, Price Modern had been required to hold the furniture longer than originally contracted for.

earlier. Mr. Reichard's conclusions include a finding that the ESS work did not delay AGJV's completion of the project because, among other things, AGJV's schedule was planned to be completed by June 15, 2012, while the ESS was not set to be installed until June 19, 2012 (Reichard Report at 29) and that, in general, "no excusable or compensable delay occurred after November 30, 2011," a date when AGJV had contended to the Navy it had expected to complete the project by March 29, 2012 (*see id*. at 46).

DECISION

As alluded to above, for the most part, the Navy has the better argument: AGJV has not proved that the representations of the site conditions in the contract were misleading and, to the extent that the soil encountered was weaker than reflected in the boring logs, there is ample evidence supporting a finding that this was caused by the weather conditions and AGJV's work on the site. Moreover, no reasonable interpretation of the contract or extension of the duty of good faith and fair dealing would have entitled AGJV to impose upon the Navy a right to work more than double the number of shifts explicitly permitted in the contract and most of the delays to the contract completion date were plainly AGJV's or its subcontractors' responsibility. On the other hand, there were changes to the fire sprinkler system that are the responsibility of the Navy for which it owes compensation to AGJV. Some costs of the ESS too, remain owed by the Navy to AGJV despite the system's being contractually required. Likewise, the contract was substantially completed at an earlier date than selected by the CO for purposes of liquidated damages assessments. We discuss this all in more detail below.

### I. Consideration of Appeals Under Board Rule 11 and the Burden of Proof

This appeal is proceeding under Board Rule 11, which allows the parties to waive a hearing and instead have the Board issue a decision based on the record. Board Rule 11(a). "Unlike a motion for summary judgment, which must be adjudicated on the basis of a set of undisputed facts, pursuant to Board Rule 11, the Board 'may make findings of fact on disputed facts.'" *U.S. Coating Specialties & Supplies, LLC*, ASBCA No. 58245, 20-1 BCA ¶ 37,702 at 183,031 (citation omitted). With one exception, as the proponent of its claims, AGJV bears the burden of proving liability and damages in this appeal. *Stobil Enter.*, ASBCA Nos. 61688, 61689, 19-1 BCA ¶ 37,400 at 181,809 (citing *Wilner v. United States*, 24 F.3d 1397, 1401-02 (Fed. Cir. 1994)). The exception is liquidated damages, which are effectively a government claim to which it bears the burden of proof initially, but the burden lies with the contractor if it seeks to prove the delay was excusable. *Sauer v. Danzig*, 224 F.3d 1340, 1345 (Fed. Cir. 2000); *see also Metro Machine d/b/a General Dynamics NASSCO Norfolk*, ASBCA No. 62221, 22-1 BCA ¶ 38,096 at 185,009.

II. AGJV Does Not Prevail in its Differing Site Condition Claim

A. The Requirements for a Type I Differing Site Conditions Claim

Differing site conditions are bread and butter claims in government contracting and the law is correspondingly well settled. *See, e.g. Olympus Corp. v. United States*, 98 F.3d 1314, 1316-17 (Fed. Cir. 1996) (discussing the decades of well-established law governing differing site conditions). A Type I differing site condition, such as that alleged here, is premised upon the notion that the government has misrepresented conditions at the site and the contractor reasonably relied upon this representation to its detriment. As good a description as any of the elements of such a claim may be found in the Federal Circuit's decision of *Int'l Tech. Corp. v. Winter*, 523 F.3d 1341 (Fed. Cir. 2008):

> In order to prevail on such a site conditions claim, a contractor must establish four elements. First, the contractor must prove that a reasonable contractor reading the contract documents as a whole would interpret them as making a representation as to the site conditions. *See Renda Marine, Inc. v. United States*, 509 F.3d [1372, 1376 (Fed. Cir. 2007)] ("[A] contractor must first prove, as a threshold matter, that the contract contained some identification of the conditions to be encountered at the site."); *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998) (explaining that the court "place[s] itself into the shoes of a reasonable and prudent contractor and decide[s] how such a contractor would act in interpreting the contract documents") . . . . Second, the contractor must prove that the actual site conditions were not reasonably foreseeable to the contractor, with the information available to the particular contractor outside the contract documents, i.e., that the contractor "reasonably relied" on the representations. *Renda Marine*, 509 F.3d at 1376 ("[T]he contractor must demonstrate that the conditions encountered were not reasonably foreseeable in light of all information available to the contractor when bidding [and] that the contractor reasonably relied upon its original interpretation of the contract.") . . . . Third, the contractor must prove that the particular contractor in fact relied on the contract representation. *See id.* at 1376 . . . . Fourth, the contractor must prove that the conditions differed materially from those represented . . . . *See id.*

49

*Id.* at 1348-49. *See also CKY, Inc.*, ASBCA No. 60451, 20-1 BCA ¶ 37,575 at 182,454.

One important factor to keep in mind for the dispute before us today is just what is considered to be represented by the contract documents. The contract documents are not a guarantee that the site will remain forever the way it was when the borings or other geotechnical survey data were taken. Rather, they are a representation of what the latent conditions were at the time of contract execution. *Olympus Corp.*, 98 F.3d at 1316-18.

Thus, in the case of *Southwest Engineering Co.*, ASBCA No. 13223, 69-1 BCA ¶ 7,424, which bears some similarities to the facts here, we held that the government was not liable for a differing site condition when heavy rains, subsequent to contract award, turned the formerly dry soil at Whiteman Air Force Base into a "temporary quagmire." 69-1 BCA at 34,492-93. To be sure, the analysis that we applied in *Southwest Engineering* involved a Type II differing site condition, but the temporal nature of the conditions subsequent to contract award would apply equally to a Type I condition. As we held in that case, explaining why the changed conditions were not the responsibility of the government, "the [condition] encountered by appellant was not a condition of the soil which antedated, or existed at, the time when the contract was entered into." *Id.* (citing *John McShain, Inc. v. United States*, 179 Ct.Cl. 632, 638, 375 F.2d 829, 833 (1967)). Aptly enough, *Southwest Engineering* involved "lean clays," just like those presented here, and we noted that, "[t]he fact that lean clayey soil will become difficult to compact . . . when excessively moist from rains is a phenomenon of common knowledge in the construction industry . . . ." *Id.* at 34,493.

## B. AGJV has not Proved That the Soils Were Different Than Represented in the Contract Documents

Notably absent from the evidence presented by AGJV is any suggestion that the type of soil encountered was different than that represented in the boring logs. Yes, AGJV alleged that its firmness was different than anticipated—at least at some spots—but not that its composition was any different than represented. Nor is there any evidence that, at the time the borings were made, the "blow counts," representing how firm the soil was, were in any way inaccurate or a misrepresentation of the soil's status at the time. Though AGJV's witnesses have testified that there was less-than-firm soil at the two-foot level at the time they sought to compact it, they have not provided evidence that this proves there was a misrepresentation in the documents. This is especially so since, as discussed in the Facts section, above, Part 3, Section G10 of the RFP cautioned that the geotechnical data that had been provided with the RFP was "not guaranteed to fully represent all subsurface conditions" and that bidders should expect "minor variations between the borings."

50

The RFP's expressed limitations are consistent with the Federal Circuit's explanation of just what is represented by a boring log. In *H.B. Mac*, the agency had provided several boring logs of the property in question, but had not taken borings near the site of some of the work. When the company performed work at the site near where the borings had been taken, it found that the soil was consistent with what had been represented, but when it performed work away from the boreholes, it encountered soil different than reflected in the logs that had been provided. *H.B. Mac*, 153 F.3d 1341-42. The court did not find that the boring logs necessarily represented what conditions would be throughout the entire project, but represented what the conditions were where the samples were taken and that it was a question of fact whether a reasonable contractor, armed with the knowledge such a contractor was expected to possess, would have relied upon them to extrapolate the subsurface conditions at some distance from where they were taken. *Id.* at 1347-48. Applying such reasoning here, we conclude that the borings provided in the RFP did not constitute a Navy guarantee that, throughout the entire location of the project, the subsurface conditions would be identical to that found in the 17 borings; rather, the borings provided a baseline of information and it was the responsibility of the contractor to make a reasonable determination of what it should expect to encounter based upon what the boring logs showed, where they were located, and other information available to a reasonable contractor. If a reasonable contractor would rely on a single boring at the site of the entrance road to plan exactly how deep the firm soil would be throughout the entirety of that area, then the government would be responsible for any deviation from such reasonable expectations. Conversely, if a reasonable contractor would make only limited presumptions based upon a single boring in a particular area, the government is not responsible for any unreasonable extrapolations.

For our purposes, we are helped by the fact that the RFP required AGJV to obtain a geotechnical expert to interpret the subsurface data. The report by ECS (with which neither party appears to take issue) warns of just the sorts of problems that AGJV encountered, prescribing pro-active steps to prevent soft soil conditions. Moreover, ECS anticipated, almost as a given, that AGJV would encounter some areas of soft or unsuitable soils that would need to be identified, removed, and replaced. Mr. Hren's expert testimony on behalf of the government is consistent with the ECS report, and amplifies the evidence that the type of soil present at the site was liable to have moisture control problems once disturbed.

Although AGJV argues that it properly dewatered the site and took steps to ensure that the ECS recommendations were complied with, we find the direct evidence of this to be lacking. No individual for AGJV has testified that such actions were taken except that it was usually the way things were done on a Grimberg job. No reflection of such steps can be found in any of the daily reports as we would expect if they had been rigorously followed. Instead, the daily reports reflect ample rain and a relatively poorly controlled job site with slurry from the geothermal wells making

51

some (but likely limited) negative impact to the soil, but also utility trenches, the moving of heavy construction equipment and multiple instances of local flooding caused by water main breaks that were the responsibility of AGJV all doing their part to disturb the soil.

In sum, given our findings of fact regarding the treatment of the work site, the soil conditions encountered were exactly those that ECS warned AGJV it could encounter and are consistent with Mr. Hren's expert testimony. We find no differing site condition and deny this appeal.

III. AGJV had no Contractual Right to Work After Hours and the CO's Refusal to Grant it *Carte Blanche* to do so was no Violation of the Duty of Good Faith and Fair Dealing

A. AGJV had no Contractual Right to Work After Hours

The contract specified the regular hours of work as being the 8 1/2-hour period between 7:00 a.m. and 3:30 p.m., Monday through Friday, excluding government holidays. This is straightforward enough. So, too, is the contractual right to exceptions: it requires approval of the CO and the contractual provision states that the CO "may approve" such a request "[b]ased on the justification provided." The use of "may," rather than "shall," means that the CO has the discretion to say no. *Cf. Andersen Consulting v. United States*, 959 F.2d 929, 932 (Fed. Cir. 1992) ("may" in a statute connotes discretion).

Moreover, nothing about these contract provisions is in any way ambiguous, which means that extrinsic evidence of AGJV's experience in other contracts has no bearing upon the way we should interpret this particular contract. *United States v. Ford Motor Co.*, 463 F.3d 1267, 1278 (Fed. Cir. 2006); *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375-76 (Fed. Cir. 2004).[52] Even if we were to consider the evidence of past practice that AGJV has provided, we would find it far less compelling than AGJV makes it out to be. As discussed in the Facts section, above,

---

[52] Citing *TEG-Paradigm Envt'l, Inc. v, United States*, 465 F.3d 1329, 1339 (Fed. Cir. 2006) and other cases, AGJV argues that "[t]he plain language of the contract must also be construed in accordance with the parties' course of prior dealings." (*See* app. br. at 119). This was a surprising sentence for us to read because *TEG-Paradigm* is commonly cited for the proposition that, once a contract's terms are found to be unambiguous, there is usually no need to engage in the consideration of extrinsic evidence. *See* 465 F.3d at 1338. In any event, the *TEG-Paradigm* court's examination of prior dealings was limited to confirming for itself that it read the plain language of the contract consistently with the parties' understanding and nothing more. *Id*. at 1339.

most of the instances cited by AGJV were materially different than the circumstances presented here, involved contracts which post-dated this one, and the evidence was far from conclusive as to what obligations the Navy had taken upon itself to approve work outside of regular hours. No instances cited by AGJV involved the Navy's granting the kind of wholesale, blanket extensions of work time requested here.

    B.  <u>The Navy's Denial of AGJV's Requests for Saturday Work was not a Violation of the Duty of Good Faith and Fair Dealing</u>

AGJV argues that, to the extent that the work hours clause gave the CO the discretion to allow work outside regular hours, the CO was required to exercise that discretion reasonably and that the CO's failure to do so here constituted a violation of the contractual duty of good faith and fair dealing (app. br. at 115-28).

    1.  <u>The Duty of Good Faith and Fair Dealing Does Require the Reasonable Exercise of the CO's Discretion as Cabined by the Terms of the Contract</u>

The doctrine of good faith and fair dealing is based upon the notion that every contract "imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981)); *see also Kelly-Ryan, Inc.*, ASBCA No. 57168, 18-1 BCA ¶ 36,944 at 180,030; *Relyant, LLC*, ASBCA No. 59809, 18-1 BCA ¶ 37,085 at 180,539. Pursuant to this implicit duty, each party's obligations "include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Metcalf*, 742 F.3d at 991 (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

This duty is not free-floating but is tied to the explicit terms of the contract. As we explained in *Relyant*:

> [T]his implicit duty "cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *Metcalf*, 742 F.3d at 991 (quoting *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010)). Thus, the duty "is limited by the original bargain: it prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value." *Metcalf*, 742 F.3d at 991.
>
> - - -

53

[T]he doctrine imposes duties that fall within the broad outlines set forth by the express terms of the contract, approximating the parties' intent, as divined by the express terms of the contract, for addressing circumstances not specifically set forth by the contract. This interpretation is consistent with the *Metcalf* court's reference to "faithfulness to an agreed common purpose." 742 F.3d at 991 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a). As we noted in a pre-*Metcalf* opinion, the proper inquiry regarding the duty often boils down to questions of "reasonableness" of the government's actions, *see Free & Ben, Inc.*, ASBCA No. 56129, 09-1 BCA ¶ 34,127 at 168,742, although we do not hold here that every unreasonable government action necessarily constitutes a breach of the duty.

18-1 BCA ¶ 37,085 at 180,539. The Federal Circuit's decision in *Dobyns v. United States*, 915 F.3d 733 (Fed. Cir. 2019), further made clear that "the duty must be 'keyed to the obligations and opportunities established in the contract' so as not to fundamentally alter the parties' intended allocations of burdens and benefits associated with the contract." 915 F.3d at 739 (quoting *Lakeshore Eng'g Servs., Inc. v. United States*, 748 F.3d 1341, 1349 (Fed. Cir. 2014)).

2.  The Boundaries of Reasonable Discretion Here

The contract provisions at issue here direct a specified work schedule, but allow the CO to make exceptions "based upon the justifications provided" with 15 days advanced notice. Based upon the arguments before us, what this means in the context of the duty of good faith and fair dealing is that when extra hours are requested, the CO's determinations should be subject to a review for abuse of discretion; that is, the CO should be expected to act reasonably.[53]

Neither party has cited a case in which it was held that the duty of good faith and fair dealing had been breached by a CO's failure to grant extra workdays in circumstances similar to those here. AGJV has cited cases in other tribunals, notably the 1975 decision by the Department of Agriculture Board of Contract Appeals in *Greenwood Constr. Co.*, AGBCA No. 435, 75-2 BCA ¶ 11,624, which, AGJV asserts,

---

[53] We are hesitant to hold that in every instance in which a contract grants discretion to the CO, that exercise of discretion is always subjected to a reasonableness review due to the existence of the duty of good faith and fair dealing, even if that may often be the case. Here, though, there is no convincing argument advanced that this exercise of discretion should not be so reviewed.

held that the government's failure to approve weekend work when the contractor was behind schedule precluded the government from assessing liquidated damages (app. br. at 127-28). But *Greenwood*, which is not binding on us in any event, does not include any analysis about the application of the duty of good faith and fair dealing and involves a very different clause involving the hours of work—never setting expected days or the parameters of the CO's review. *See* 75-2 BCA ¶ 11,624 at 55,492. It is decidedly unhelpful here.

The other case cited by AGJV, *Manuel Bros., Inc. v. United States*, 55 Fed. Cl. 8 (2002), (*see* app. br. at 122), which, too, is not binding upon us, appears to support the *government's* position. In *Manuel Bros.*, the CO refused a blanket request for 12-hour days and work on Saturdays, but did grant 23 extra workdays. This, the Court of Federal Claims found, was no abuse of discretion. *Manuel Bros.*, 55 Fed. Cl. at 40-41. Thus, though the number of workdays granted by the CO in *Manuel Bros.* was relatively high, they were individually decided and the refusal to grant a blanket extension was not an abuse of discretion.

3. The CO did not Abuse her Discretion

We find that the CO reasonably exercised her discretion in denying AGJV's blanket requests for additional work hours. First, it is important to note that she granted three weekend days plus 12-hour weekdays. Given the fact that this 12-hour shift availability was utilized from January 2012 until at least July of that year, the amount of time granted compares very favorably to the 23 days provided in the *Manuel Bros.* case discussed above and which AGJV cites to as support for its view that the duty of good faith and fair dealing applies to the granting of extra work hours.[54]

Moreover, providing the time requested for every Saturday from January through July of 2012 would have imposed significant costs upon the government. With respect to financial costs, as Mr. Gannon testified, the work would have required the presence of a government representative who would have been paid overtime – overtime that was not regularly available due to Navy policies which were not particularly directed at AGJV. As Mr. Gannon testified, AGJV's offer to pay for the overtime was a hollow promise because such augmentation of appropriated funds, without Congressional authorization, is contrary to fiscal law.[55]

---

[54] Though AGJV has argued that the 12-hour days were no better than 8-hour shifts, as discussed in our findings of fact, we find this to be exaggerated: AGJV would not have availed itself of the opportunity if it had not been to its benefit.

[55] This unrebutted testimony is consistent with our long understanding of the operation of fiscal law. Though not cited by either party, the Department of Defense Financial Management Regulation (FMR), DoD 7000.14-R, ¶ 2.1.10 (June

There would also have been the cost to the personnel involved. Mr. Gannon's office, from whom the site supervisors would have come, was short staffed at the time, and providing an individual every Saturday, in addition to covering the 12-hour days during the week would have presented real challenges.[56]

Against these costs to the Navy and serious practicability challenges, the ACO weighed what would be advanced by agreeing to AGJV's blanket requests. Her observations did not support a conclusion that a grant of blanket requests would be well-used, and we find this conclusion not unreasonable or unsupported.

Thus, considering all the facts and circumstances surrounding the ACO's consideration of AGJV's blanket requests to work on the weekends, including her granting AGJV the right to work 50% longer shifts during the week than were anticipated by the contract, we do not find her denial of these requests to constitute an abuse of her discretion.[57] This appeal is denied.

IV.  AGJV is Entitled to Some Relief on its Fire Sprinkler Claims

AGJV's fire sprinkler claims basically have two components:  first, that AGJV encountered a differing site conditions claim because the water flow was less than reflected in the RFP; and, second, that the Navy forced it to do work beyond that required by the contract by performing a second water flow test and also by including an unnecessary extra standpipe on the roof.  As will be seen, we agree with AGJV that the lower water pressure it encountered, and which required its subcontractor to redesign the system was a differing site condition.  We also agree with AGJV that it should not have been required to provide the extra standpipe.  Nevertheless, AGJV's subcontractor should have performed the additional water flow test prior to

---

2020) characterizes the receipt of funds without Congressional authorization and their deposit anywhere but the Miscellaneous Receipts account of the United States Department of the Treasury as an augmentation of an appropriation, in violation of the Antideficiency Act, 31 U.S.C. §§ 1341-1342 and 31 U.S.C. § 1517.  Here, AGJV fails to identify any statutory authority that would permit the Navy to accept non-appropriated funds from AGJV to cover federal overtime pay.

[56] The incredible assertions in AGJV's brief that the Navy should have supported two 8-hour shifts a day, seven days a week (an accommodation never requested) would obviously have imposed even more significant costs on the Navy personnel who would have needed to oversee the construction.

[57] Had AGJV made more directed requests, to work on particular weekends for particular reasons, we might have come to a different conclusion (or we might not have – after all, the ACO did grant the request on three other occasions), but that is not what was presented here.

creating its design, thus the government is not liable for the costs of conducting the flow test and the proper liability upon the government is not the cost of having to repeat the design of the system, but whatever additional costs would have been incurred in designing and building a system that could operate with the lower water flow and the unnecessary standpipe compared to designing and building a system that could handle the higher flowrate anticipated and without the flow rate.

A. Applicable Legal Principles – Differing Site Conditions and Constructive Changes

We have discussed the differing site conditions clause at length earlier in this decision. We note that, though differing site conditions cases most often involve geologic or geotechnical data, we see no reason why the language in the differing site conditions clause (applying to "subsurface or latent physical conditions at the site," *see* FAR 52.236-2(a)) should not apply to information about such things as the water flow rates at the pipes involved here (which is, after all, a physical condition at the site), and the Navy has not argued otherwise.[58]

The alleged additional work required by the Navy, AGJV argues, is a constructive change to the contract (app. br. at 151-52). Constructive change allegations are also commonplace in government contract disputes and are straightforward: "To demonstrate a constructive change, a plaintiff must show (1) that it performed work beyond the contract's requirements, and (2) that the additional work was ordered, expressly or impliedly, by the government." *BGT Holdings, LLC v. United States*, 948 F.3d 1003, 1012 (Fed. Cir. 2020) (citing *Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014)). Once a constructive change has been found, the government is obligated to compensate the contractor for its additional costs. *Aydin Corp. v. Widnall*, 61 F.3d 1571, 1577 (Fed. Cir. 1995) (citing *J.B. Williams Co. v. United States*, 450 F.2d 1379, 1394 (Ct. Cl. 1971)). Just like the circumstances in the Changes Clause, however, the contractor is generally obligated to inform the CO that it considers the work being ordered to be beyond the scope of the contract within 20 days of that direction. FAR 52.243-4(d); *K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1009-10 (Fed. Cir. 2015). Indeed, in *K-Con*, the contractor's compliance with the government's directives and failure to object or assert

---

[58] Arguably, though no party asserted it, these claims might have been pursued as defective specifications. *See, e.g., Robins Maint. v. United States*, 265 F.3d 1254, 1257 (Fed. Cir. 2001) (defective specifications found when contract specifications are inaccurate and mislead the contractor); *see also Comtrol, Inc. v. United States*, 294 F.3d 1357, 1362 (Fed. Cir. 2002) (differing site conditions and defective specifications cases, though distinct in theory, may collapse into the same cause of action under the appropriate facts). Perhaps. If they had been, we have no reason to believe the results would have been any different.

that it was a violation of contract terms until two years later supported a finding that the contractor was not entitled to compensation for the constructive change. *K-Con*, 778 F.3d 1009-11.

## B. The Flow Rate was a Differing Site Condition

The evidence before us does not tell us why, but there is no factual dispute that the water flow rate which dictated the ultimate design of the fire sprinklers was different than that represented in the solicitation. Although it may be considered odd that the Navy provided flow rate information in the solicitation and then required the contract awardee to conduct its own tests, this is consistent with the industry standards noted above, requiring recent (within a year of design) flow tests—standards that would not be met if AGJV had relied only on the flow test information contained in the solicitation.

Does this difference make a differing site condition as AGJV contends? The Navy makes no effort, whatsoever, to argue that it does not, focusing instead on the damages and asserting that there were none (*see* gov't br. at 146-48). In any event, we are satisfied that AGJV has met the criteria for a differing site condition claim that we cited earlier from *International Technology Corp.*: a reasonable contractor would have read the solicitation as making a representation of the site conditions (here, the water flow rate); there is no basis for AGJV to have foreseen that the conditions would change to the degree that they did; AGJV relied upon the flow rate in the solicitation since its firm fixed price subcontract with Fire-Mak was premised upon the flow rates included in the solicitation (which appear to have been substantially the same as in the 2009 flow test conducted on AGJV's behalf);[59] and, inasmuch as the lower flow rates experienced in 2011 required a re-design of the sprinkler system, they were plainly materially different. *See* 523 F.3d 1348-49.

---

[59] We imagine that the Navy might have advanced an argument that it was AGJV's own post-award flow tests that it relied upon when it made its contract with Fire-Mak, and not the tests in the solicitation. That would have been an interesting argument had the Navy bothered to make it. But at the end of the day, we are persuaded that AGJV bid upon a contract that represented one particular flow rate, but was required to build a fire sprinkler system that could accommodate a lower flow rate. Given the absolute lack of argument to the contrary in this particular case, we will not find that this constitutes anything but a differing site condition.

C. Requiring a Recent Flow Test was not a Constructive Change to the Contract

We find AGJV's argument that it was not required by the contract to perform a flow test within one year of submitting its design to be unpersuasive. First, as discussed in the Facts section above, the UFC standards required that the design be based on "recent water flow test data." Though "recent" is undefined there, NFPA standards in effect at the time of contract award (and which the parties relied upon) required a flow test within one year of the design of the hose and standpipe system, which is part of the system that AGJV was required to install. Requiring compliance with contractual requirements is no change.

This was no surprise to AGJV, which explicitly contracted with Fire-Mak to perform a flow test if required.[60] Moreover, AGJV appears to have acceded, without complaint, to the Navy's direction to perform an additional flow test after it submitted Fire-Mak's plans and calculations to the Navy for review. Though it complained about other aspects of the Navy's rejection of its plans (notably, about the standpipe), AGJV's acquiescence to the direction to perform a new flow test dooms that portion of its constructive change claim because it indicates that a current flow test was required by the contract and also because it was a failure to comply with the prerequisites of the Changes Clause.

D. Requiring the Standpipe on the Rooftop was a Change

Simply enough, as noted in the in the Facts section, NFPA 14 does not require a standpipe on the rooftop if there is access to the roof from the highest landing and there was a hose connection in that landing. Since there was such access, it was sufficient to have the hose connection in that landing as Fire-Mak and AGJV had initially proposed. Re-writing the plans to include the extra standpipe and the extra costs to install it constituted a contract change for which AGJV is entitled compensation.

E. The Navy's Responsibility for AGJV's Fire Sprinkler Costs

Though the appeal has been broken into "entitlement" and "quantum" components, at the entitlement stage it is still necessary to determine what costs the contractor will be entitled to. Here, it is not all that AGJV anticipates.

---

[60] This would be another basis for denying these "costs" to AGJV: it had a firm fixed price contract with Fire-Mak that covered this contingency and would have shielded it (AGJV) from incurring any additional costs for Fire-Mak's running the extra flow test.

Having found a differing site condition, we find that AGJV is entitled to the extra costs that flowed from it. That increased cost is whatever AGJV can prove was the difference in cost of a fire sprinkler system that meet the needs of the higher flow rates represented by the solicitation versus the needs of the lower flow rates it ultimately encountered. It appears, for example, that the new design required wider pipes. If, as we assume, larger diameter pipes are more expensive than the smaller pipes AGJV and Fire-Mak planned on, then it is entitled to the difference in price of the pipes and any other costs that increased as a consequence of the lower flow.

AGJV is also entitled to the material, labor, and design costs associated with the additional stand pipe, as they would not have been incurred except for the contract change.

AGJV is not entitled to redesign costs stemming from the larger re-design required when the additional flow tests demonstrated that the initial Fire-Mak design was inadequate. Those tests were contractually required and expected to be considered prior to the final design by AGJV and its subcontractor. Yes, those flow tests disclosed the differing site condition, but if they had been accomplished prior to Fire-Mak's design, as required, Fire-Mak would not have had to re-accomplish said design.[61]

V. The Mess That is the ESS, and why AGJV is Entitled to no Additional Time, but Some Additional Costs for it

The parties have engaged in an argument over whether the contract required AGJV to install the ESS (albeit, through an approved subcontractor and paid for separately) (*see* gov't br. at 148-49; app. reply br. at 52-60). We find that it did: Section D603005, Security Systems, which we quote more fully in the Facts section above, provides, in unambiguous terms, that the "[contractor] must sub out the electronic security system installation to a contractor with direct experience in installing/integrating the new system . . . ." The other sections cited in the Facts section also make clear the intention that the prime contractor hire an ESS subcontractor at government expense, but be responsible for building the infrastructure (such as conduit) for the ESS and coordinating with that subcontractor. Though the parties appear to have inexplicably forgotten what was in the RFP during the first two years of contract performance, this does not matter because, in general, absent ambiguity we do not go beyond the terms of the contract to interpret it, *see, e.g.,*

---

[61] Theoretically, we suppose, it could be more expensive to design a fire sprinkler system that could handle a low flow rate than one for a high flow rate, though that seems unlikely to us in these circumstances. If it is, in fact, the case, however, AGJV is welcome to present evidence supporting this theory and it would be entitled to the difference.

*TEG-Paradigm*, 465 F.3d at 1339, and this includes prior performance in particular. *See Watts Constructors, LLC*, ASBCA No. 61493, 20-1 BCA ¶ 37,563 at 182,386.

Yet, this conclusion, which, at first blush, seems so central to the dispute, actually matters little (if at all) to the ultimate resolution of the appeal before us. This is primarily because of the effects of Mod P2, which gave AGJV most of what it was seeking as if the ESS work were not required by the contract, leaving only the questions of whether AGJV was entitled to more time on the contract than given by the modification and whether it was fully compensated for ESS work that it performed and was intended to be separately funded. As discussed below, we find that AGJV is entitled to no additional time for its work on the ESS, but is owed more money.

A. <u>AGJV has not proved That the Government is Responsible for Delay Caused by the ESS</u>

Though we find that, under the contract, AGJV was responsible for obtaining an ESS subcontractor, to be paid by a separate Navy entity, that, by itself, does not quite let the Navy off the hook: it waited more than two years after contract award before taking steps to provide funding for that ESS subcontractor and it can be argued that it did not move with the speed it could or should have even then. To be sure, our finding that installation of the ESS was AGJV's contractual obligation diminishes the strength of this argument, but, even so, in the right circumstances, we might need to consider how to apportion blame between the parties for the delays in beginning work on the ESS.

These are not those circumstances. Though the CO ultimately extended the contract completion date by 126 days to account for the ESS, in truth, there is no evidence that installation of the ESS played *any* role in the delay in completing the contract. Rather, as discussed at length in the Facts above, the real problems were to be found elsewhere, such as the roof, the curtain wall, the windows, and the HVAC system. Moreover, the CO informed AGJV that the ESS would play no role in determining the substantial completion date: had everything else been completed except for the ESS, that would have been fine.

The record provides little indication that the installation of the ESS appreciably impacted other work on the building. The only instance where it might have had any impact that we have noticed is the fact that AGJV held off on closing some drywall on March 14, 2012 to allow for inspection of ESS conduit and boxes and did not close that drywall until about April 26, 2012. But the record is bereft of any evidence that even this action had any effect on the critical path of project completion. On its face, this drywall matter does not appear to be significant; it was nothing that AGJV complained about at the time; and there is no evidence that it affected the critical path. For its own reasons, AGJV provided no scheduling expert on this (or any other

matter), while the Navy provided Mr. Reichard, who provided evidence that the ESS installation caused no delay to the completion of the project. With the evidence as it stands, we would have no basis to award any delay days to AGJV for the Navy's late direction to install an ESS system even if we were to find that all fault for this was with the Navy.

## B. AGJV is Entitled to Some Other Costs Associated With its Claim

The other issue before us is the $30,513 in direct costs that AGJV asserts were not covered by Mod P2. The Navy argues that exterior work was plainly required by section G403007 of the contract, which was a section not subject to the requirement for a separate funding stream discussed in Section D503005 (gov't br. at 148-49). But Section D503005 provides that "MCON Construction Project funds cannot be used" for the ESS, meaning that the funding must all come from a stream separate and apart from the general contract award. This section makes no distinction between the interior and exterior ESS. Hence, there is no basis to withhold the moneys requested for exterior ESS work.[62] The remaining money sought is for design work on the ESS and scheduling associated with it. The Navy makes no argument on this matter and the aspects of separate funding for the ESS in Section D503005 applies to its "design, procurement and installation" and is not limited to expenses incurred by the ESS subcontractor. To the extent that AGJV incurred these costs for design and installation of the ESS—a matter the Navy does not appear to seriously dispute, it is entitled to them.[63]

## VI. AGJV is Entitled to the Return of Some Liquidated Damages

The liquidated damages here are straightforward: they are the difference in time between the BOD and the CCD as extended by contract modifications.[64] The last contract extension (made long after the contract was actually complete) brought the CCD to August 22, 2012. The government had found the BOD to be September 29, 2012, and withheld liquidated damages based upon the difference between those two dates. Since, earlier in this opinion, we found that the building was ready for its intended use on September 18, 2012, there is a difference of 11 days of liquidated damages that the government will need to return to AGJV.

---

[62] To be clear, we are not speaking here of the infrastructure work to support the ESS, which all agree was required by the contract here and not subject to a separate funding stream, just the actual ESS components, themselves.

[63] As the parties chose to separate quantum from entitlement at this stage of the proceedings, we do not decide here exactly how much these costs are.

[64] Of course, if the CCD should have been extended farther due to changes to the contract, we would be required to take that into account, but that did not happen here.

This is a relatively straightforward application of the (found) facts to a standard contract clause. AGJV also makes the argument that, because the government extended the work on the contract after the CCD, it cannot collect liquidated damages (*see* app. br. at 133-35). This is a misapplication of the cases that AGJV cites and the facts presented here. Those cases (*e.g., Sun Shipbuilding & Dry Dock co. v. United States*, 76 Ct. Cl. 154 (1932); *Framlau Corp.*, ASBCA No. 14479, 71-2 BCA ¶ 9,082) stand for the simple proposition that, for purposes of liquidated damages, the government cannot add work to a contract after its completion date and expect it to be completed without extending the contract's completion date. What they do not stand for is the notion that, if any work is added to a contract after the original CCD, the government is forever barred from asserting liquidated damages, even if the CCD has been properly adjusted to take into account the extra work. The extra work alleged here, having to do with the fire sprinkler and ESS, had no bearing, whatsoever, on the BOD. Though the government very generously extended the CCD in Mod P2 and in the CO's decision on the ESS claim, ostensibly as a result of the ESS work, that does not mean that the government was actually at fault and that it was responsible for delays in the number of days it extended the CCD. *See, e.g.*, *England v. Sherman R. Smoot Corp.*, 388 F.3d 844, 856-57 (Fed. Cir. 2004). More to the point, there is no evidence that any of the work being performed after the final CCD had passed was a consequence of extra work having been imposed by the government. To the contrary, the fire sprinkler system was long completed before the CCD as was the ESS. And even if the ESS had not been completed as early as it was, it would have had no bearing on the BOD since the CO had already agreed not to consider it for BOD purposes.

Entitlement to liquidated damages from the CCD of August 22, 2012 until the BOD of September 18, 2012 at the contractual rate of $5,250 per day was proved by the government.

VII. AGJV is not Entitled to Acceleration Costs

The last claim we address is acceleration costs. AGJV argues that, because of the government's demand that it perform additional work on the ESS and fire sprinkler system for which it did not initially extend the performance period and the government's failure to permit additional night and weekend work, it was forced to incur overtime and otherwise accelerate its work to minimize the government's imposition of liquidated damages. This, according to AGJV, makes out a constructive acceleration claim, long recognized by the Board. (*See* app. br. at 135-36 (citing *Parsons Evergreen, LLC*, ASBCA No. 58634, 18-1 BCA ¶ 37,137 at 180,811-12,[65] *partially overturned on other*

---

[65] AGJV's brief referenced the Westlaw "star" cites, but we replace them here with pinpoint citations from the Board's reporter.

*grounds, Parsons Evergreen, LLC v. Sec'y of Air Force*, 968 F.3d 1359 (Fed. Cir. 2020); *IAP Worldwide Servs., Inc.*, ASBCA No. 59397 *et al.*, 17-1 BCA ¶ 36,763 at 179, 158-60))

We agree with AGJV's general explication of constructive acceleration law, which was explained straightforwardly by the Federal Circuit in *Zafer Taahhut Insaat ve Ticaret A.S. v. United States,* 833 F.3d 1356 (Fed. Cir. 2016):  "Constructive acceleration often occurs when the government demands compliance with an original contract deadline despite excusable delay by the contractor."  *Id.* at 1562 (quoted by *IAP Worldwide Servs.*, 17-1 BCA ¶ 36,763 at 179,158).  The five elements of constructive acceleration are:  1) the contractor encountered an excusable delay; 2) the contractor made a timely request for an extension of time to complete the contract; 3) the government denied the request or did not act on it in a reasonable period of time; 4) the government insisted on completion of the contract in a lesser period of time than the excusable delay would have permitted; and 5) that the contractor incurred added expense to compensate for the lost time and remain on schedule.  *Zafer Taahhut*, 833 F.3d at 1362 (citing *Fraser Constr. Co. v. United States*, 384 F.3d 1534, 1360-61 (Fed. Cir. 2004)).

AGJV's acceleration argument is facially reasonable:  when the government started assessing liquidated damages against AGJV in April 2012, it had no choice but to accelerate its work and incur overtime costs because it had no way of knowing that the government would ever extend the completion date in the manner that it did with Mod P2 and the CO's later extension after the ESS claim.  We also credit AGJV's evidence that it incurred acceleration costs through overtime for several of its subcontractors.

But this is not enough for AGJV to prevail.  The most salient fact here is that there was no excusable delay for most of the work on the project (e.g., the roof, the HVAC system, and the windows), and that was the work that dragged completion of the project out to September 18, 2012.  To underscore the essential:  there has been zero evidence presented by AGJV that work on the ESS or the fire sprinklers caused a delay in the critical path to project completion and certainly nothing on the order of the amount of time that the Navy ultimately granted (put another way, the excusable delay was certainly not greater than the extensions granted by the Navy).  Hence, as we discussed in the section on liquidated damages above, the sprinkler and the ESS were not the problems that held up contract completion and, even after the Navy's generous extension of time for the ESS, AGJV was still almost four weeks late in completing the project.  AGJV's "acceleration" may well have been motivated by the initial March 29, 2012 completion date, but even if, in March, 2012, the Navy had extended the completion date until the August 22, 2012 date that it ultimately granted, AGJV would still have had to significantly pick up the pace on its work in May 2012 as it did because even the "acceleration" it undertook when it thought it had less time than was

ultimately granted was insufficient for it to timely complete the project.[66] AGJV has not cited nor have we found a case where the contractor completes the work *after* the date for which the government should have granted an extension and is nevertheless able to recover on an acceleration claim.

AGJV's appeal on constructive acceleration is thus denied.

## CONCLUSION

For the reasons discussed above:

We deny Appeal No. 61252, the differing site conditions claim.

We deny Appeal No. 61402, the claim regarding working hours.

As detailed above, we grant, in part, Appeal No. 60428, the fire sprinkler claim. Appeal No. 60691, which was a protective appeal on the same matter is subsumed into our decision on Appeal No. 60428. Appeal No. 60428 is remanded to the parties to calculate damages in accordance with this decision.

As detailed above, we grant, in part, Appeal No. 60426, the ESS claim. Appeal No. 60689, which was another protective appeal on this subject is subsumed into our decision on Appeal No. 60426. Appeal No. 60426 is remanded to the parties to calculate damages in accordance with this decision.

The liquidated damages asserted by the Navy and appealed in Appeal Nos. 60427 and 60690 are partially sustained and partially denied. Because Appeal No. 60690 is the appeal of the most up to date government claim for liquidated damages, we consider Appeal No. 60427 to be subsumed to it. The quantum for liquidated damages needs no remand: the government holds the money, to our understanding, and we have held that 11 days of damages at $5,250 per day are due and owing to AGJV, which sums to $57,750.

---

[66] Could AGJV argue that it would have accelerated its work less had it known in April 2012 that it had until August 22, 2012? Such a hypothetical argument would be unconvincing because if it put in less work in May, it would have presumably completed the project even later than it did and been subject to greater liquidated damages. In any event, the evidence does not support such a fine parsing of degrees of lateness by AGJV.

The parties have not briefed the subject of when interest should accrue on these damages, so this must be addressed on the remand to the parties.

Finally, Appeal No. 61715, for the acceleration claim, is denied.


Dated: May 30, 2023

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

ELIZABETH WITWER
Administrative Judge
Armed Services Board
of Contract Appeals


I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 60426, 60427, 60428, 60689, 60690, 60691, 61252, 61402, 61715, Appeals of Amatea/Grimberg JV, rendered in conformance with the Board's Charter.

Dated: May 30, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals